336 Conn. 747 JUNE, 2021 747

State *v.* Lamantia

## STATE OF CONNECTICUT *v.* JASMINE LAMANTIA
### (SC 20190)

Robinson, C. J., and Palmer, McDonald, D'Auria,
Mullins, Kahn and Ecker, Js.*

*Syllabus*

Convicted, after a jury trial, of the crime of tampering with a witness, the
defendant appealed to the Appellate Court, claiming, inter alia, that there
was insufficient evidence to support her conviction. The defendant's
boyfriend, R, and her former boyfriend, M, had engaged in an altercation
outside of her home. M, who was injured, called the police, after which
R left the premises. A state police officer who responded to the scene
spoke with M in the presence of the defendant, and M told the officer
that he had been assaulted by R and another person who was with R
at the time. The officer then went to R's residence, where R showed
him his cell phone and told him that he should read the text messages
between the defendant and R. In those text messages, the defendant
informed R that the police were coming and instructed R to have blood
on his clothes. The defendant further told R that M had reported to the
police that R attacked him but that the defendant's statement to the
police was that M was bloody when he arrived at her home because he
was in a bar fight somewhere else. The defendant directed R to tell the
police that M stalks her and emphasized that they needed to stick to
the same story. The officer subsequently confronted the defendant about
the text messages, and she stated that the text messages were taken
out of context. At trial, however, the defendant denied sending the
text messages. The Appellate Court upheld the defendant's conviction,
concluding that the jury reasonably could have found that the defendant
tampered with a witness, R, by sending him text messages shortly after
his altercation with M. On the granting of certification, the defendant
appealed to this court, claiming that the Appellate Court improperly
had upheld her conviction because there was insufficient evidence from
which a jury reasonably could find that she had specifically intended
to interfere with a witness' testimony at an official proceeding. *Held*
that the Appellate Court correctly determined that the jury reasonably
could have found that the defendant tampered with a witness when
she sent R text messages shortly after his altercation with M: the jury
reasonably could have inferred that, when the defendant sent the text
messages to R, she believed that an official proceeding was pending or
was about to be instituted at which R would likely be a witness, as
there was evidence presented at trial that the defendant knew of and
contributed to the investigation of the altercation, knew there were

* The listing of justices reflects their seniority status on this court as of
the date of oral argument.

State *v.* Lamantia

witnesses to the altercation, including herself, knew there was physical evidence of the altercation, namely, M's injuries, knew the police were taking M's complaint against R seriously, and knew that the police were interested in contacting R regarding the altercation; moreover, the jury also reasonably could have inferred that the defendant induced or attempted to induce R to testify falsely at that proceeding, as there was evidence that the defendant knew that R was a critical witness to the altercation under investigation and that she had instructed R on how to fabricate his statement to the police so that it would match with her statement, and the defendant's own false testimony before the jury regarding the nature of her relationship with R and her denial that she ever had sent the text messages in question to R reasonably could have led the jury to infer that, because she had no qualms about giving false testimony herself, she intended for R to do the same when it was his turn to testify.

(*Three justices dissenting in two separate opinions*)

Argued October 16, 2019—officially released September 3, 2020**

*Procedural History*

Substitute information charging the defendant with the crimes of interfering with a police officer and tampering with a witness, brought to the Superior Court in the judicial district of New London, geographical area number twenty-one, and tried to the jury before *A. Hadden, J.*; verdict and judgment of guilty, from which the defendant appealed to the Appellate Court, *DiPentima, C. J.*, and *Alvord* and *Pellegrino, Js.*, which reversed in part the trial court's judgment and remanded the case to that court with direction to render judgment of not guilty on the charge of interfering with a police officer, and the defendant, on the granting of certification, appealed to this court. *Affirmed.*

*Conrad Ost Seifert*, assigned counsel, for the appellant (defendant).

*Melissa L. Streeto*, senior assistant state's attorney, with whom, on the brief, were *Michael Regan*, state's attorney, and *Christa L. Baker*, assistant state's attorney, for the appellee (state).

** September 3, 2020, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

State *v.* Lamantia

*Opinion*

KAHN, J. The defendant, Jasmine Lamantia,[1] appeals from the judgment of the Appellate Court affirming the judgment of conviction, rendered after a jury trial, of tampering with a witness in violation of General Statutes § 53a-151 (a).[2] *State* v. *Lamantia*, 181 Conn. App. 648, 671, 187 A.3d 513 (2018). The defendant claims that the Appellate Court incorrectly concluded that there was sufficient evidence to permit a jury to reasonably infer that, when she sent text messages to her boyfriend, Jason Rajewski, after his altercation with David Moulson, the defendant had the specific intent to interfere with a witness' testimony at an official proceeding. Specifically, the defendant contends that there was no evidence to infer that she thought it was more probable than not that a future criminal trial would occur, or that she thought Rajewski would probably testify at such a trial. The state responds that the evidence was sufficient to prove beyond a reasonable doubt that the defendant intended to induce Rajewski to testify falsely in an official proceeding that she believed to be imminent. We conclude that the Appellate Court correctly determined that the jury reasonably could have found that the defendant tampered with a witness by sending Rajewski text messages shortly after his altercation with Moulson. Accordingly, we affirm the judgment of the Appellate Court.

From the evidence presented at trial, the jury could have reasonably found the following facts.[3] On the eve-

---

[1] At the time of trial, the defendant had changed her last name to Bernardi. For the purposes of this opinion, we continue to refer to her as Lamantia.

[2] This court granted the defendant's petition for certification to appeal, limited to the following issue: "Did the Appellate Court properly conclude that the evidence was sufficient to prove beyond a reasonable doubt that the defendant intended to induce a witness to testify falsely in an official proceeding that she believed to be pending or imminent, in violation of General Statutes § 53a-151 (a)?" (Internal quotation marks omitted.) *State* v. *Lamantia*, 330 Conn. 919, 194 A.3d 290 (2018).

[3] As the Appellate Court noted, "this case is replete with conflicting testimony regarding the timing and nature of the relationships between the

State *v.* Lamantia

ning of July 24, 2015, Earl F. Babcock and Rajewski
socialized for three or four hours at a bar in Norwich.
At that time, the defendant was in a romantic relation-
ship with Rajewski.[4] At some point in the evening, the
defendant also arrived at the bar where Babcock and
Rajewski were socializing. After midnight and in the
early morning hours of July 25, 2015, at the defendant's
suggestion, Babcock and Rajewski, in Babcock's car,
followed the defendant from the bar to a house located
at 18 Bunny Drive in Preston, where some teenagers,
including the defendant's son, Joshua Bivens, were hav-
ing a party. When they arrived, the defendant and Bab-
cock parked their cars, and the defendant immediately
went inside the house. Rajewski and Babcock lingered
near Babcock's car, and, before they had the opportu-
nity to go inside the house, Moulson, the defendant's
former boyfriend, arrived and pulled his car into the
driveway, shining the car's headlights on Babcock and
Rajewski. Moulson exited his car, and he and Rajewski
had a verbal and physical altercation that resulted in

various parties, as well as the events of the night of July 24, 2015, and the
early morning of July 25, 2015. It was for the jury, and not this court, to
resolve discrepancies in the testimony.'' *State* v. *Lamantia*, supra, 181 Conn.
App. 650 n.1. We observe that one would be hard-pressed to find a criminal
case without some degree of conflicting testimony and muddled motivations,
and we emphasize that, ''[n]otwithstanding our responsibility to examine
the record scrupulously, it is well established that we may not substitute
our judgment for that of the trial court when it comes to evaluating the
credibility of a witness. . . . It is the exclusive province of the trier of
fact to weigh conflicting testimony and make determinations of credibility,
crediting some, all or none of any given witness' testimony. . . . Questions
of whether to believe or to disbelieve a competent witness are beyond our
review. As a reviewing court, we may not retry the case or pass on the
credibility of witnesses. . . . We must defer to the trier of fact's assessment
of the credibility of the witnesses that is made on the basis of its firsthand
observation of their conduct, demeanor and attitude.'' (Internal quotation
marks omitted.) *State* v. *DeMarco*, 311 Conn. 510, 519–20, 88 A.3d 491 (2014).
The presence of conflicting testimony is the hallmark of an adversarial
system, not the basis upon which to reverse the reasonable findings of a jury.

[4] In July, 2015, the defendant and Moulson lived together and may have
also been in a relationship.

State *v.* Lamantia

Rajewski striking Moulson and Moulson bleeding from his face.

During the altercation, the defendant was inside the house. One of the kids at the party came into the house saying that Rajewski and Moulson were there, and the defendant stepped back outside where she saw Moulson running toward the house with Rajewski and Babcock behind him. Moulson ran into the house to call the police, and the defendant told Babcock and Rajewski that Moulson was calling the police and that they should "get out of [there]." The defendant went back into the house and stood beside Moulson, trying to minister to his wound, while he called the police. Following the defendant's warning that Moulson was calling the police, Babcock and Rajewski left 18 Bunny Drive. Babcock dropped Rajewski off at his home, and then Babcock proceeded directly home himself.

Jonathan Baker, a Connecticut state trooper, received a dispatch to 18 Bunny Drive for an active disturbance at approximately 2:30 a.m.; he and another trooper responded. Baker spoke to Moulson in the presence of the defendant, and Moulson told Baker that, as he pulled into the driveway of the house, he was assaulted by two males, one of whom he identified as Rajewski. Moulson and the defendant gave Baker Rajewski's address, and Baker proceeded to that address to continue the investigation. The other trooper stayed at 18 Bunny Drive to continue speaking with Moulson, which resulted in Moulson being taken into custody in the presence of the defendant.

At Rajewski's residence, Baker knocked on the door and, when Rajewski answered, asked if Rajewski knew why he was there. Rajewski indicated that he did know why Baker was there and presented Baker with his cell phone, telling Baker he should read the text message conversation between the defendant and Rajewski. The

text messages from the defendant notified Rajewski that the police were coming and instructed him to have blood on his clothes. Baker further testified that the defendant told Rajewski that Moulson reported to the police that Rajewski had attacked him while he was in his car but that the defendant's statement to the police was that Moulson was bloody when he got there because he was in a bar fight somewhere else. The defendant directed Rajewski to tell the police that Moulson stalks the defendant and Rajewski followed her to 18 Bunny Drive because he loves her. The defendant emphasized to Rajewski that they needed to stick with the same story, but Rajewski informed her that he was going to tell the truth that Moulson attacked Rajewski first. Based on his review of the text messages, Baker concluded that the defendant had requested that Rajewski lie to him.

While Baker was holding Rajewski's cell phone, Rajewski received a call from Babcock, and Baker answered the call at Rajewski's request, proceeding to have a conversation with Babcock. Baker asked Babcock if they could speak, and Babcock provided Baker with his home address with the understanding that Baker would be there shortly. Baker arrested Rajewski and took him to the state police barracks, and then Baker went to see Babcock at Babcock's home. Baker took Babcock into custody as well and transported him to the barracks for processing. Later that morning, the defendant arrived at the barracks to pick up Moulson. At that time, Baker confronted the defendant about the text messages she had sent to Rajewski. The defendant told Baker that "it was autocorrect, spellcheck made her do that," and that the text messages were "taken out of context and her phone made her do it." Further, when Baker asked what her intent was with respect to the text messages, the defendant responded "that's not how I meant it." Baker placed the defendant under arrest on charges of tampering with a witness in viola-

State *v.* Lamantia

tion of § 53a-151 (a) and interfering with a police officer in violation of General Statutes § 53a-167a. See footnote 6 of this opinion.

We note that the jury's verdict in the present case was also informed by the following testimony offered by the defendant at trial. The defendant testified that she did not tamper with a witness because she did not send the text messages to Rajewski at all. She denied sending the text messages to Rajewski, claiming that they were not sent from her phone or, if they were, that someone else had sent them. During cross-examination, the defendant denied that she was in a relationship with Rajewski at the time of the altercation with Moulson, claiming that their relationship spanned several months,at the most, from "April to like June-ish." When confronted with a signed statement she gave to the police[5] stating that she had been in a relationship with Rajewski until August, 2015, the defendant testified that she "may have made a mistake . . . ." Regardless of the timing of their relationship, the defendant was adamant that she was not in love with Rajewski either at the time of the altercation with Moulson or afterward. The state introduced into evidence a Facebook message that the defendant sent to Babcock on August 16, 2015, in which she said, "I love [Rajewski] with all my heart and would do anything for him! I'm sure [you] know he just broke up with me. . . . I'm sure you know I lied and said I saw [Moulson] get out of his car and go after [Rajewski] in court. . . . I'm sure [you] know I gave him 100 [percent] of me and loved him unconditionally when he was at his worst! [A]nd would give up everything I have to be with him . . . . [S]o I'm sure [you] know he broke my heart . . . . [P]lease tell him

_____

[5] The defendant became aware that Rajewski had stolen her credit cards in the two weeks prior to the events at issue in the present case. The defendant gave a statement to the police on October 21, 2015, in conjunction with her filing of a complaint against Rajewski alleging that he had stolen her credit cards, a crime for which Rajewski was arrested.

State *v.* Lamantia

I will be here waiting. And he's my soulmate . . . .
[H]e brought out the real me after being abused for
[seven] years . . . .'' When questioned about this mes-
sage, however, the defendant once again denied know-
ing anything about it or having sent it. The defendant
claimed, rather, that either the messages were not sent
from her account but from a fake account that someone
else set up, or that someone had hacked her account.

The jury returned a verdict of guilty of tampering
with a witness in violation of § 53a-151 (a), and the trial
court imposed a sentence of one year of incarceration,
execution suspended, and two years of probation.[6] The
defendant appealed, claiming, inter alia, ''that the evi-
dence was insufficient to support her conviction of
tampering with a witness. Specifically, she [argued] that
the state failed to prove that she sent the text messages
to Rajewski with the specific intent required for a con-
viction [under] § 53a-151 (a), that is, the intent to influ-
ence a witness at an official proceeding.'' (Footnote
omitted.) *State* v. *Lamantia*, supra, 181 Conn. App. 663–
64. The Appellate Court concluded that the ''evidence
established that the defendant was aware of Baker's inves-
tigation of the physical altercation involving Rajew-
ski, Babcock, and Moulson.'' Id., 670. In addition, the
Appellate Court stated that ''[t]he jury could also find
that the defendant, knowing that Baker investigated the
physical altercation that had occurred at [18] Bunny

---

[6] The defendant was also convicted of interfering with a police officer in
violation of § 53a-167a. The trial court imposed a concurrent sentence, as
to that conviction, of one year of incarceration, execution suspended, and
two years of probation. The defendant claimed on appeal that the evidence
was insufficient to support her conviction of interfering with a police officer.
*State* v. *Lamantia*, supra, 181 Conn. App. 653–54. The Appellate Court agreed
with the defendant, concluding that there was insufficient evidence to sustain
her conviction for interfering with a police officer, and remanded the case
to the trial court with direction to render a judgment of acquittal on that
charge and to resentence the defendant on the conviction of tampering with
a witness. Id., 663, 671.

State *v.* Lamantia

[Drive] and had learned the identity of the participants, including Rajewski, believed that an official proceeding probably would result therefrom." Id. The Appellate Court, therefore, affirmed the witness tampering conviction, concluding that the jury reasonably could have found that the defendant tampered with Rajewski by sending him text messages shortly after his altercation with Moulson. Id., 669–70. This appeal followed.

We now turn to the defendant's claim that there was insufficient evidence for a jury to find that she specifically intended to interfere with a witness' testimony at an official proceeding. "When reviewing a sufficiency of the evidence claim, we do not attempt to weigh the credibility of the evidence offered at trial, nor do we purport to substitute our judgment for that of the jury." (Internal quotation marks omitted.) *State* v. *Ortiz*, 312 Conn. 551, 572, 93 A.3d 1128 (2014); see footnote 3 of this opinion. "[W]e construe the evidence in the light most favorable to sustaining the verdict. . . . We then determine whether the jury reasonably could have concluded that the evidence established the defendant's guilt beyond a reasonable doubt." (Citation omitted.) *State* v. *Elmer G.*, 333 Conn. 176, 183, 214 A.3d 852 (2019). "[W]e do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the [finder of fact's] verdict of guilty." (Internal quotation marks omitted.) *State* v. *Crespo*, 317 Conn. 1, 17, 115 A.3d 447 (2015); see also *State* v. *Rodriguez*, 146 Conn. App. 99, 110, 75 A.3d 798 (defendant who asserts insufficiency claim bears arduous burden), cert. denied, 310 Conn. 948, 80 A.3d 906 (2013). When a claim of insufficient evidence turns on the appropriate interpretation of a statute, our review is plenary. See, e.g., *State* v. *Webster*, 308 Conn. 43, 51, 60 A.3d 259 (2013).

State *v.* Lamantia

"A person is guilty of tampering with a witness if, believing that an official proceeding is pending or about to be instituted, he [or she] induces or attempts to induce a witness to testify falsely . . . ." General Statutes § 53a-151 (a). "An 'official proceeding' is any proceeding held or which may be held before any legislative, judicial, administrative or other agency or official authorized to take evidence under oath, including any referee, hearing examiner, commissioner or notary or other person taking evidence in connection with any proceeding." General Statutes § 53a-146 (1). A " '[w]itness' is any person summoned, or who may be summoned, to give testimony in an official proceeding." General Statutes § 53a-146 (6). Section 53a-151 (a) applies to "any conduct that is intended to prompt a witness to testify falsely or refrain from testifying in an official proceeding that the perpetrator believes to be pending or imminent." *State* v. *Cavallo*, 200 Conn. 664, 668, 513 A.2d 646 (1986). Therefore, to support the defendant's conviction, the state had to demonstrate beyond a reasonable doubt that (1) the defendant believed that an official proceeding was pending or was about to be instituted at which Rajewski would likely be a witness, and (2) the defendant induced or attempted to induce Rajewski to testify falsely at that proceeding. See, e.g., *State* v. *Ortiz*, supra, 312 Conn. 554, 562; *State* v. *Pommer*, 110 Conn. App. 608, 614, 955 A.2d 637, cert. denied, 289 Conn. 951, 961 A.2d 418 (2008); *State* v. *Bennett-Gibson*, 84 Conn. App. 48, 52–53, 851 A.2d 1214, cert. denied, 271 Conn. 916, 859 A.2d 570 (2004). It is important to note that "[i]ntent may be, and usually is, inferred from the defendant's verbal or physical conduct. . . . Intent may also be inferred from the surrounding circumstances. . . . The use of inferences based on circumstantial evidence is necessary because direct evidence of the accused's state of mind is rarely available. . . . Furthermore, it is a permissible, albeit not a necessary or mandatory, inference that a defen-

State *v.* Lamantia

dant *intended the natural consequences of his volun-
tary conduct.*'' (Emphasis in original; internal quotation
marks omitted.) *State* v. *Bennett-Gibson*, supra, 53.

An official proceeding that was pending or was about
to be instituted includes not only those proceedings
that have been initiated, but also those that are probable
or ''readily apt to come into existence or [to] be contem-
plated'' by a defendant. (Emphasis omitted; internal
quotation marks omitted.) *State* v. *Ortiz*, supra, 312
Conn. 570; *State* v. *Foreshaw*, 214 Conn. 540, 551, 572
A.2d 1006 (1990). ''The crucial role police involvement
would play in that process cannot be disputed''; *State*
v. *Foreshaw*, supra, 551; and, as a result, ''attempts to
influence witnesses that happen to occur during a police
investigation are [not] excluded from the purview of
the statute,'' so long as ''the defendant acts . . .
believing that such a proceeding will probably occur
. . . .'' *State* v. *Ortiz*, supra, 570–72. In coming to that
conclusion in *Ortiz*, this court analyzed the statutory
construction of § 53a-151 (a). Id., 561–67. We specifi-
cally considered whether, by not including the words
''investigation,'' ''inform,'' or ''informant'' as included in
Model Penal Code § 241.6 (1), the legislature intended
to exclude ''situations in which the defendant seeks to
prevent an individual from speaking with the police.''
(Internal quotation marks omitted.) Id., 568. ''We
agree[d] that the legislature restricted the scope of the
witness tampering statute by omitting these words, but
the scope of the restriction was minimal.'' Id. ''[Section]
53a-151 (a) applies whenever the defendant believes
that an official proceeding will probably occur, even if
the police are only at the investigation stage.''[7] (Empha-

_____

[7] It is well established that, in interpreting a statute, this court is bound
by our prior constructions of the statute. See, e.g., *Kasica* v. *Columbia*, 309
Conn. 85, 93–94, 70 A.3d 1 (2013); *Hummel* v. *Marten Transport, Ltd.*, 282
Conn. 477, 494–95, 923 A.2d 657 (2007). We must presume that the legislature
is aware not only of this rule of statutory construction, but also of our
interpretation of § 53a-151 (a) in *Ortiz*. See, e.g., *State* v. *Courchesne*, 296
Conn. 622, 717, 998 A.2d 1 (2010). It is through this interpretive lens that

State *v.* Lamantia

sis omitted.) Id., 568–69. Furthermore, "[a]s long as the *defendant* believes that an official proceeding will probably occur, it does not matter whether an official proceeding is *actually* pending or is about to be instituted." (Emphasis in original.) Id., 569. This court has held that, "when [a] [defendant] knows that a witness with relevant information already has spoken with the police, a jury reasonably could infer that the [defendant] believed that the investigation probably would progress into an official proceeding." Id., 571; see also *State* v. *Pommer*, supra, 110 Conn. App. 619–20 (holding that jury reasonably could have inferred that defendant believed official proceeding was about to be instituted when defendant knew police were aware of identities of participants in robbery—one of whom was defendant— and eyewitness had provided that information to police).

In *Ortiz*, the court set forth two hypothetical scenarios that illustrate with precision the minimal nature of the restriction in instances in which the alleged witness tampering has occurred during the police investigation phase, before charges are brought or a suspect is arrested. First, "consider a scenario in which an individual com-

we must view the legislature's determination to amend General Statutes § 53a-155, effective October 1, 2015, by adding a reference to a "criminal investigation conducted by a law enforcement agency," but failing to make a similar amendment at that time to § 53a-151 (a). See Public Acts 2015, No. 15-211, § 9. "Although we are aware that legislative inaction is not necessarily legislative affirmation . . . we also presume that the legislature is aware of [this court's] interpretation of a statute, and that its subsequent nonaction may be understood as a validation of that interpretation." (Internal quotation marks omitted.) *State* v. *Courchesne*, supra, 717. By choosing not to adopt changes to the language of § 53a-151 (a) that were proposed one year after our decision in *Ortiz*, we agree with the conclusion in Justice D'Auria's dissent that "we can infer that the legislature did not reject our interpretation in *Ortiz*, leaving *Ortiz* in place as good law . . . ." Put another way, in light of this court's interpretation of § 53a-151 (a) in *Ortiz*, which made clear that the omission of the term "investigation" effected only a minor limit on the scope of § 53a-151 (a); *State* v. *Ortiz*, supra, 312 Conn. 568–69; we must infer that the legislature, being aware of that interpretation, did not see any need to amend the statute.

State *v.* Lamantia

mits a crime that results in no physical evidence, and in which the individual thereafter attempts to prevent the one witness to the crime from speaking to the police. The individual certainly could believe that the police would investigate the crime, but he would have no reason to believe that an official proceeding would probably occur because there would be no evidence or witnesses on which the police could rely to identify and arrest the individual.[8] In contrast, when an individual

---

[8] Just four months following its decision in *Ortiz*, this court considered under what circumstances a jury could reasonably infer that a defendant thought that an official proceeding was probable to support a conviction of tampering with physical evidence in violation of § 53a-155 (a). *State* v. *Jordan*, 314 Conn. 354, 376–79, 102 A.3d 1 (2014) (In considering whether defendant believed that official proceeding was pending or likely to be instituted, this court concluded that "§ 53-155 (a) applies, no matter what stage the police have *actually* reached in their investigation, as long as the defendant believes that it is *probable* that an official proceeding will arise. This interpretation is consistent with the commentary to the Model Penal Code . . . . It is also consistent with our interpretation of an identical phrase in . . . § 53a-151 (a)." (Citation omitted; emphasis in original; footnote omitted; internal quotation marks omitted.)). *Jordan* provided scenarios similar to those provided in *Ortiz*: "For instance, in a scenario in which an individual commits a crime with no witnesses, and he immediately thereafter discards the one piece of physical evidence connecting him to the crime, the individual certainly could believe that the police would investigate the crime, but he would have no reason to believe that an official proceeding would likely occur because there would be no evidence or witnesses upon which the police could rely to locate and arrest him. In contrast, when an individual knows that there is significant evidence connecting him to the crime, a jury reasonably could infer that the individual believed that the investigation probably would progress into an official proceeding. We emphasize, however, that it is not the existence of an investigation that is key but, rather, whether the defendant believes an official proceeding is pending or probable." (Footnote omitted.) Id., 382–83.

With those distinctions in mind, this court concluded in *Jordan* that the defendant discarded the only physical evidence tying him to the crime and that there was no evidence that the police officer knew his identity or of any other information connecting him to the crime. Id., 386. In other words, at that point in time, the discarded physical evidence was the only evidence linking the defendant to the crime. Id. The defendant discarded it to prevent detection or to avoid being implicated in the crime *in the first instance*, and, without such evidence, the police would not know of his involvement in the crime. Id., 381, 384. These facts were similar to the first illustrative

State *v.* Lamantia

knows that there is significant evidence connecting him to the crime, or, even further, when the individual knows that a witness with relevant information already has spoken with the police, a jury reasonably could infer that the individual believed that the investigation probably would progress into an official proceeding.'' (Footnote added.) *State* v. *Ortiz*, supra, 312 Conn. 570–71.[9] These two contrasting scenarios make clear that, when the facts demonstrate that the defendant was aware that there was significant evidence connecting him to the crime or that at least one witness had spoken to the police, an attempt to tamper with witnesses during a police investigation falls under the purview of § 53a-151 (a).

The term ''[w]itness,'' as defined by § 53a-146 (6), is broad, because it includes ''any person summoned, or

scenario outlined previously, and, therefore, a jury could not reasonably infer that the defendant believed that an official proceeding was probable. Id., 386.

*Jordan* is distinguishable from the present case. In the present case, the defendant claims that she attempted to convince Rajewski to lie to the police to help prevent him from being arrested and charged with assault. However, Rajewski had *already been implicated in the crime* by Moulson and the defendant, and Babcock was also aware of Rajewski's identity. Even without Rajewski's statement, the police would have known of his involvement in the assault. These facts more closely align with the second illustrative scenario posited by this court in both *Ortiz* and *Jordan*, whereas the facts in *Jordan* more closely align with the first scenario.

[9] Justice Ecker's dissent misconstrues this court's decision in *State* v. *Ortiz*, supra, 312 Conn. 551. That dissent states that, ''[o]ur inquiry in *Ortiz* . . . ultimately and necessarily turned on the defendant's intent with respect to the official proceeding itself.'' The determination of whether the defendant believed that an official proceeding is pending or about to be instituted is not wholly independent of interference in a prearrest police investigation. A jury may consider a defendant's attempt to induce a potential witness to lie to the police during a prearrest investigation as evidence of his intent to affect that witness' conduct at a future, official proceeding. *State* v. *Ortiz*, supra, 564–65; see also *State* v. *Cavallo*, supra, 200 Conn. 673–74. It is immaterial whether a warrant has been issued or an arrest has been made, and ''it does not matter whether the police are at the investigation stage, the official proceeding stage, or any other stage . . . .'' *State* v. *Ortiz*, supra, 571.

State *v.* Lamantia

*who may be summoned*, to give testimony . . . .''
(Emphasis added.) If the jury reasonably could find that
the defendant knew that an individual had information
relevant to the underlying crime, and knew that the
individual ''had provided a statement'' to the police,
it would be ''reasonable for the jury to infer that the
defendant believed that the [individual] probably would
be called to testify in conformity with that statement
at a future proceeding.'' (Internal quotation marks omit-
ted.) *State* v. *Sabato*, 321 Conn. 729, 732, 748, 138 A.3d
895 (2016).

In the present case, the jury was presented with evi-
dence that the defendant had more than mere knowl-
edge of an investigation. The jury heard evidence that
the defendant knew there had been a physical alterca-
tion between Moulson, Rajewski, and Babcock; observed
head injuries on Moulson; was present when Moulson
called 911 to report the assault; knew that Baker and
the other responding state trooper were investigating
the altercation; provided the state troopers with the
name and home address of Rajewski; and was aware
that the troopers had the names of all three men
involved in the altercation. The defendant testified that
she was present at 18 Bunny Drive at the time of the
altercation, and, although she was inside of the house
and did not see the start of the altercation, she saw
Moulson running from Rajewski and Babcock and into
the house with blood on Moulson's face. The defendant
and Babcock testified that the defendant warned Rajew-
ski and Babcock that Moulson was calling the police
and instructed them to leave 18 Bunny Drive, further
indicating that she knew they had been in an altercation
and that the police had been summoned. The defendant
and Moulson both confirmed that the defendant was
present when Moulson called the police to report the
incident, and Baker testified that the defendant was
present while he spoke with Moulson. The defendant
testified that she provided Baker with Rajewski's home

State *v.* Lamantia

address. Under these circumstances, a jury reasonably could conclude that the defendant (1) had knowledge of—and contributed to—the investigation, (2) knew there were—and identified for the police—witnesses to the incident, including herself, (3) knew there was physical evidence of the crime as evidenced by Moulson's injuries, and (4) knew that the police were taking the complaint seriously enough to track down witnesses in the middle of the night. On the basis of this evidence, the jury could reasonably infer that the defendant believed that the investigation probably would progress into an official proceeding.[10] See *State* v. *Ortiz*, supra, 312 Conn. 570–71.

In addition, the jury was presented with evidence, including the defendant's own testimony, that she knew that Baker was interested in contacting Rajewski regarding the altercation, and that he would probably be called as a witness. The defendant testified that, after Rajewski was identified as a participant in the

---

[10] Justice Ecker's dissent takes umbrage at the state's assertion during closing arguments that it "had satisfied its burden of proof with respect to the defendant's belief that an official proceeding was pending or imminent because it had established that the defendant 'knew the cops were involved' and, therefore, '[c]learly . . . knew that a proceeding ha[d] been instituted,' " calling that argument an "egregious misstatement of law." A review of the state's closing argument relating to the witness tampering charge suggests that the state's argument contained more than a simple reference to knowing "the cops were involved," by accurately reciting the elements of the offense and the evidence the state felt proved both elements. Specifically, during that portion of the state's closing argument, it argued: "With regards to the charge of tampering with a witness, in order to prove that charge, the state needs to prove two elements, *the defendant believed that an official proceeding was about to be instituted and that* [*Rajewski*] *was likely to be a witness, and the defendant induced or attempted to induce him to testify falsely or with false testimony. This requirement, the requirement of the defendant believing an official proceeding was about to be instituted can be satisfied if the defendant knew that she could have been implicated in a crime and she asked, threatened, or induced a witness to withhold evidence from* [*the*] *police.* It does not matter that it was in the investigative phase of the criminal justice process. It doesn't matter that the police were still figuring out what happened. It just matters that she intended to prevent that witness from speaking with [the] police or [from] telling the police the truth.

"The state feels it has met its burden of proof with regards to both of these elements in that [the defendant] spoke with the police. She knew the

State *v.* Lamantia

altercation, she provided his address to Baker, who left
18 Bunny Drive to go to Rajewski's home. Rajewski
testified that the defendant, knowing that Baker was en
route to Rajewski's home, sent Rajewski text messages
telling him to get away because the police were coming.
Baker's testimony confirmed that the text messages

cops were involved. She told them to leave, the cops were coming. She
spoke with them at the home. Clearly, she knew that a proceeding has been
instituted. Clearly, she knew an investigation was currently in the process.
She knew [Rajewski] was likely to be a witness. How did she know this?
By her own testimony, she gave the police [Rajewski's] name. [Moulson]
knew that [Rajewski] was likely to be a witness because he told the police
he was the one who assaulted him. As far as her inducing or attempting to
induce a witness to testify falsely, you heard the officer testify to the text
messages that she sent that night. Again, we'll get into that more later. She
sent those text messages telling him, hey, this is my story, basically. This
is my story, this is what I told the cops. We need to match. This is what
you need to tell them. [Rajewski] resisted. He said, no, let's just tell them
the truth. Let's tell them the truth. This is what happened. No, our stories
need to match. You need to tell them this. So, I feel the state has met its
burden of proof with regards to both elements of this crime, and we will
we be asking you find the defendant guilty.'' (Emphasis added.)

Viewed in its entirety, the state's closing argument relating to the witness
tampering charge was not misleading. See, e.g., *State* v. *Felix R.*, 319 Conn.
1, 9, 124 A.3d 871 (2015) (''[w]hen reviewing the propriety of a prosecutor's
statements, we do not scrutinize each individual comment in a vacuum but,
rather, review the comments complained of in the context of the entire
trial'' (internal quotation marks omitted)). The state's argument was consis-
tent with its theory of the case as articulated on the first day of trial, when
the state's attorney noted that ''the crux of the state's claim during the
course of this case is going to be that [the defendant] lied to [the] police
and attempted to get [Rajewski] to lie to [the] police in order to protect
him and herself.'' The state's argument clearly places this case in the second
scenario illustrated in *Ortiz*, described previously in this opinion, because,
at the time the defendant tampered with a witness, she had knowledge of the
existence of multiple witnesses and significant evidence. This is a perfectly
permissible line of argument consistent with *Ortiz*. Even if the state had
misstated the law during closing argument, the trial court properly instructed
the jury on the essential elements of the offense, as the dissent concedes.
Further, the court repeatedly instructed the jury, including prior to closing
arguments, that, ''[i]f in any way counsel makes a statement regarding the
law that differs from what I instruct you on, it's what I say that counts.''
See, e.g., *State* v. *Williams*, 258 Conn. 1, 15 n.14, 778 A.2d 186 (2001) (''[i]t
is a fundamental principle that jurors are presumed to follow the instructions
given by the judge'' (internal quotation marks omitted)). It is also important
to note that the defendant did not challenge the claim that an official proceed-
ing was probable. Rather, the defendant's theory of the case was that the
text messages and witness tampering claims were fabricated by Rajewski
in order to get the defendant in trouble because she previously had him
arrested for stealing her credit cards.

State *v.* Lamantia

from the defendant to Rajewski "essentially [said] the cops [were] coming, make sure you're bloody and . . . [Moulson was] abusive to her." Baker further testified that "[the defendant] want[ed] [Rajewski] to tell the police or [Baker] that [Moulson] stalks her. [The defendant] said [Moulson] was bloody when he got there. [The defendant] told [the troopers] that [Moulson] was in a bar fight somewhere else. And . . . [Rajewski] only followed [the defendant] to that residence [at 18 Bunny Drive] because he loves her." Baker also stated that the defendant told Rajewski "that they need to stick with the same story and it would be good. They have to match." Baker testified that Rajewski was upset with the defendant's text messages and told her "no, I'm telling the truth. [Moulson] tried to kick my ass, so I beat him up. And then . . . enough is enough." Baker further testified that the defendant responded that "[Rajewski's] story has to match [hers]. [Moulson] looks crazy. [Moulson] deserves it because of the beatings he's [done] to [her]." Baker testified that the crux of the text conversation was that the defendant wanted Rajewski to lie to the troopers, specifically, Baker. On the basis of this evidence, a jury reasonably could infer that, knowing that an official proceeding was probable, the defendant's text messages to Rajewski warning him that the police were coming, directing that Rajewski be bloody when Baker arrived, and providing Rajewski with a false narrative of events that matched the false information she allegedly gave to Baker, demonstrated a clear understanding by the defendant that Rajewski's testimony would be critical at a future proceeding. See *State* v. *Sabato*, supra, 321 Conn. 748 ("[i]ndeed, the defendant stated in one of those messages, 'it's YOUR statement that is gonna fuck it up,' thereby demonstrating the defendant's clear understanding that [the witness'] testimony would be critical at such a proceeding").

The same evidence introduced by the state to prove that the defendant believed an official proceeding was

State *v.* Lamantia

about to be instituted at which Rajewski would likely
be a witness was also sufficient to allow the jury to
infer that the defendant induced or attempted to induce
Rajewski to testify falsely at that proceeding.[11] "[A] jury
may consider a defendant's attempt to prevent an indi-
vidual from giving a statement to the police as evidence
of [her] intent to influence the testimony of that individ-
ual at a future official proceeding. This conclusion is
limited, of course, by the statutory requirements that
(1) the defendant believe[d] an official proceeding [had]
been or [was] about to be instituted, and (2) the individ-
ual probably [would] be called to testify at that proceed-
ing." *State* v. *Ortiz*, supra, 312 Conn. 560. When these
statutory requirements are met, it is reasonable to infer
that the defendant "intended the natural consequences
of [her] act, that is, to induce the [individual] to testify
falsely at the [proceeding]." Id., 565. Furthermore, "it
does not matter whether the police are at the investi-
gation stage, the official proceeding stage, or any other
stage; [so] long as the defendant acts with the intent
to prevent a witness from testifying at an official pro-
ceeding, believing that such a proceeding will probably
occur, the defendant has tampered with a witness
within the meaning of § 53a-151 (a)." Id.; see also *State*

---

[11] The defendant contends that, by sending the text messages to Rajewski,
she was solely attempting to prevent Rajewski's arrest. The jury, however,
"is not required to accept as dispositive those inferences that are consistent
with the defendant's innocence. . . . The trier may draw whatever infer-
ences from the evidence or facts established by the evidence it deems to
be reasonable and logical. . . . This does not require that each subordinate
conclusion established by or inferred from the evidence, or even from other
inferences, be proved beyond a reasonable doubt . . . because this court
has held that a [jury's] factual inferences that support a guilty verdict need
only be reasonable. . . .

"[A]s we have often noted, proof beyond a reasonable doubt does not
mean proof beyond all possible doubt . . . nor does proof beyond a reason-
able doubt require acceptance of every hypothesis of innocence posed by
the defendant that, had it been found credible by the [jury], would have
resulted in an acquittal." (Internal quotation marks omitted.) *State* v. *Seeley*,
326 Conn. 65, 72–73, 161 A.3d 1278 (2017).

State *v.* Lamantia

v. *Pommer*, supra, 110 Conn. App. 618 (''[w]e reject the contention that discouraging the witness from speaking to the police could not suffice when there was evidence that the defendant believed an official proceeding was imminent'').

The jury was presented with evidence that the defendant knew Rajewski had been involved in a physical altercation with Moulson and Babcock, Baker was actively investigating Moulson's complaint that he was assaulted by Rajewski and Babcock, and Baker was on his way to Rajewski's home to continue his investigation of the alleged assault on Moulson. Evidence was also presented that the defendant knew Rajewski was a critical witness to the investigation and that she instructed Rajewski on how to fabricate his statement to Baker so it matched hers.

As with the first element, the defendant's own testimony supported an inference that she attempted to induce Rajewski to testify falsely at a future official proceeding. This is not a case in which the defendant declined to take the stand to testify and the jury did not have the benefit of her version of events from which to assess her credibility or infer her intent. Nor did the defendant take the stand and testify, as she now claims on appeal, that she only wanted to protect Rajewski and to prevent him from being charged with assault because she loved him.[12] Instead, at trial, the defendant adamantly denied being in a relationship with Rajewski, being in love with him, and sending him any text messages the night of the altercation. She maintained these

---

[12] This may have been a closer case if the jury had not heard—and clearly discredited—the defendant's own testimony, in which she adamantly denied sending any text messages to Rajewski for any purpose, rather than claim, as she does on appeal, that she sent them to protect him. In essence, the defendant asks this court to determine that the jury could have reasonably inferred an intent from conduct that the defendant herself disavowed under oath at trial.

State *v.* Lamantia

claims even when repeatedly impeached by her own conflicting testimony, official statements to the police, and incriminatory messages from her Facebook account. The jury obviously found the defendant to be dishonest and not credible because it rejected her claim that someone else had sent the text messages to Rajewski. In other words, the jury reasonably could have concluded that the defendant had no qualms about perjuring herself on the witness stand and, from such a finding, could have inferred, in light of all the other evidence, that the defendant intended Rajewski to do the same thing when the time came. This undermines any suggestion that the defendant could not be presumed to have contemplated that Rajewski should lie at any trial that resulted from the police investigation of the altercation. The defendant's own testimony, coupled with all the other evidence, was sufficient to allow the jury to reasonably infer that the defendant attempted to induce Rajewski to testify falsely at a future official proceeding.[13]

[13] Justice D'Auria contends that the defendant's trial testimony simply is irrelevant to the determination of whether the jury reasonably could have concluded that the defendant was attempting to induce Rajewski to testify falsely at a likely future prosecution, apparently because that testimony occurred sixteen months after the conduct at issue. We disagree with Justice D'Auria. Although the defendant did not testify directly about that element of the offense—instead, she falsely and repeatedly asserted that she did not try to corruptly influence Rajewski at all, an assertion that, for good reason, the jury rejected as incredible—her testimony at trial afforded the jury the opportunity to evaluate firsthand her demeanor, credibility, character, sophistication, and motive. For obvious reasons, all of these considerations are highly relevant to the ultimate determination of the defendant's intent when she urged Rajewski to lie to the police. This is particularly true because state of mind is most often ascertained, as it was here, on the basis of inferences rather than direct evidence, and, so, the ability of the jury to assess the defendant's intent on the basis of her sworn testimony on the witness stand is an important factor supporting the jury's conclusion regarding that element of the offense. The fact that the defendant's testimony was given sixteen months after the events in question does not deprive that testimony of probative value with respect to what the defendant did or intended at that earlier date. Indeed, we are aware of no support in our case law, or anywhere else for that matter, for the proposition that testimony

State *v.* Lamantia

In support of her claim, the defendant states that the
required inference that she believed an official proceed-
ing was about to be instituted was not reasonable
because the underlying crime was assault and not mur-
der, and ''the probability of murder prosecutions
resulting in trials is much higher than a garden variety
G.A. prosecution . . . .''[14] We, however, find no prece-

by a witness about past events is irrelevant to the jury's assessment of that
witness' intent.

[14] In addition to her claim that the severity of the underlying crime should
be a factor to consider, the defendant advances several additional arguments
for which we conclude there is no legal basis. First, she claims that the
required inference that Rajewski would likely be a witness at a future official
proceeding was not reasonable because the case ''may be resolved by means
of nolle prosequi, diversionary programs, or a guilty plea,'' or, even if there
were a trial, Rajewski could ''[exercise] his [f]ifth [a]mendment right to not
testify.'' (Internal quotation marks omitted.) Witness tampering charges may
be brought in connection with any official proceeding, regardless of the
seriousness of the underlying crime alleged in that proceeding, and the
myriad possible future resolutions of the underlying charges are immaterial
to a determination of whether the defendant believed an official proceeding
was probable when he or she engaged in the alleged witness tampering
conduct. See, e.g., *State* v. *Sabato*, supra, 321 Conn. 732 (defendant instructed
friend not to cooperate with investigation of cell phone theft); *State* v.
*Cavallo*, supra, 200 Conn. 665 (police officer tampered with likely witness
at noncriminal arbitration proceeding). It is also immaterial whether there
are circumstances that could excuse a potential witness from testifying at
an official proceeding, including the investigation not resulting in an official
proceeding. See, e.g., *State* v. *Ortiz*, supra, 312 Conn. 569 (''it does not
matter whether an official proceeding is actually pending or is about to be
instituted'' (emphasis omitted)); see also *State* v. *Sabato*, supra, 732, 748 (it
was reasonable for jury to infer that, when defendant knew that an individual
had relayed relevant information to police, defendant believed that individual
would likely be called to testify about that information at future proceeding).

Second, the defendant argues that she did not know how the assault
allegations would be resolved because she was not a party to the underlying
crime. Any individual—including, but not limited to, friends, family members,
and associates—can engage in and be charged with tampering with a witness
under § 53a-151 (a), and such charges are not restricted to the targets or
defendants of the underlying proceeding. See, e.g., *State* v. *Bennett-Gibson*,
supra, 84 Conn. App. 50–51 (sister of defendant in underlying sexual assault
case was charged with tampering with witness when she attempted to induce
witness to drop charges against her brother). Finally, the defendant claims
that, even if the jury could reasonably infer that the defendant believed that
Rajewski would be a witness at an official proceeding, the defendant's text
messages were nonthreatening and intended merely to protect Rajewski.
Any attempt to induce a witness to testify falsely, whether by force or

State *v.* Lamantia

dent that stands for the proposition that varying levels
of criminal severity alone determine a defendant's belief
as to the probability of a future proceeding or whether
it was reasonable for the jury to reach the same conclu-
sion.[15] To the contrary, this court and the Appellate Court
have upheld convictions for tampering with a witness
related to a range of criminal and noncriminal activity.
See footnote 14 of this opinion.

In addition, if the severity of the underlying crime
were a determinative factor when deciding whether an
official proceeding was probable, that could lead to unfor-
tunate consequences by encouraging the very behavior
the statute seeks to prevent. For example, considering
the severity of the underlying crime could leave domes-
tic violence victims vulnerable, because perpetrators
could engage in manipulative or controlling behavior
designed to prevent victims from being truthful with
the police, without fear of being charged with tampering

otherwise, may result in witness tampering charges. See, e.g., id., 48 (sister
of defendant offered to help witness with bills, obtain an apartment, or
anything else necessary for witness to drop charges against her brother);
*State* v. *Coleman*, 83 Conn. App. 672, 675–76, 851 A.2d 329 (defendant
provided nonthreatening instruction on what witnesses were to say in order
to create alibi for defendant), cert. denied, 271 Conn. 910, 859 A.2d 571
(2004), cert. denied, 544 U.S. 1050, 125 S. Ct. 2290, 161 L. Ed. 2d 1091 (2005).

Nor do we believe that tampering with a witness charges require the
tamperer to benefit personally by avoiding criminal charges or a conviction,
or that the defendant personally witness the underlying crime, arguments
that were not raised by the defendant. We find no precedent to support
either of these considerations. Even if being a witness to the underlying
crime were a requirement—which it is not—in the absence of the alleged
tampering, the defendant in the present case was nonetheless a witness to
the underlying crime. If any of the participants in the altercation itself were
charged, the defendant could have expected to be called as a witness. She
was with Rajewski and Babcock immediately prior to their arrival at the
location of the altercation and had a relationship with each of the parties.
While she was in the home when the altercation began, she observed the
end of it when she saw a bleeding Moulson running toward the house and
away from Rajewski and Babcock, who were chasing Moulson.

[15] Likewise, Justice Ecker's dissent looks to the severity of the underlying
crime as a factor to consider when assessing whether a jury reasonably
concluded that the defendant believed an official proceeding was probable.

State *v.* Lamantia

with a witness. While the state does not choose to prosecute every crime, and the state is more likely to prosecute some crimes than others, preempting tampering charges for crimes perceived to be less severe would shield a defendant from charges even when other evidence and surrounding circumstances clearly support a reasonable inference that a defendant believed an official proceeding was probable. This is the situation in the present case. Moulson testified that, as a result of the assault, he was "bleeding pretty severely" and needed "seven stitches in [his] eye." The defendant testified that she observed and initially tended to this injury while Moulson called 911. Even if we assume that Moulson's injury, which required professional, medical attention, was minor in nature—and we certainly recognize that it is less severe than other crimes including, but not limited to, murder—that fact was not presented to the jury in isolation. The defendant did not have mere passing knowledge that Moulson had been assaulted, but, rather, she was present at the scene of the crime, witnessed the end and aftermath of the altercation, was involved in the police investigation, provided Rajewski's address to Baker, and knew the police were taking the allegations seriously as Baker left to immediately speak to Rajewski despite the early morning hour. Even considering the severity of the underlying crime, this evidence is sufficient for a jury to reasonably conclude that the defendant thought an official proceeding was probable.

In light of both the evidence presented at trial, including the defendant's own discredited testimony, and the reasonable inferences that could be drawn therefrom, we conclude that there was sufficient evidence for the jury to have found beyond a reasonable doubt that, at the time she sent text messages to Rajewski, the defendant (1) believed that an official proceeding was pending or was about to be instituted at which Rajewski would likely be a witness, and (2) induced or attempted

State *v.* Lamantia

to induce Rajewski to testify falsely at that proceeding. See *State* v. *Ortiz*, supra, 312 Conn. 554, 562. Therefore, the jury reasonably concluded that the defendant was guilty of tampering with a witness pursuant to § 53a-151 (a).

The judgment of the Appellate Court is affirmed.

In this opinion ROBINSON, C. J., and PALMER and MULLINS, Js., concurred.

D'AURIA, J., with whom McDONALD, J., joins, dissenting. I respectfully dissent because I conclude that the Appellate Court incorrectly concluded that the evidence was sufficient to convict the defendant, Jasmine Lamantia, of tampering with a witness in violation of General Statutes § 53a-151 (a). I do not consider this a case that only boils down to whether the jury drew permissible inferences from the evidence or engaged in improper speculation, however. Rather, in my view, recent precedents of this court involving two statutes that criminalize offenses against the administration of justice, only one of which the state charged the defendant with violating, along with recent legislative action in response to those precedents, illuminate the legislative intent and, to me, make clear that the defendant's conduct does not fall within the conduct that the legislature sought to criminalize. Specifically, I believe that, to properly examine how § 53a-151 (a) applies to the present case, we must consider, pursuant to General Statutes § 1-2z, that statute's relationship to General Statutes § 53a-155, which criminalizes tampering with physical evidence. Even more specifically, I believe that how the legislature has responded to our case law leaves an ambiguity that requires consideration of pertinent legislative history. That consideration of the legislative history and our case law leads me to conclude that the legislature did not intend to criminalize the defendant's conduct in the present case. I therefore respectfully dissent.

State *v.* Lamantia

Section 53a-151 (a) criminalizes ''tampering with a witness if, believing that an official proceeding is pending or about to be instituted, [an individual] induces or attempts to induce a witness to testify falsely, withhold testimony, elude legal process summoning him to testify or absent himself from any official proceeding.'' The allegation in this case is that the defendant attempted to induce her boyfriend, Jason Rajewski, ''to withhold testimony and to testify falsely.''[1] That allegation arises from an altercation that took place between Rajewski and two other men. Trooper Jonathan Baker of the state police investigated the altercation as a possible assault. The defendant was neither a participant in the altercation nor a witness to it. As the case is presented to us, however, the parties agree that the defendant in fact sought to induce Rajewski to lie to Baker during the course of his investigation. Specifically, she sent text messages to Rajewski in which she encouraged him to have blood on his clothes when Baker arrived to investigate, to tell Baker that the victim, David Moulson, abused her, and to stick to the same story that Rajewski was already bloody when he arrived at the party from a bar fight somewhere else, all to get Baker to believe that Rajewski did not assault Moulson.

The parties disagree over whether there is sufficient evidence that the defendant, by attempting to induce Rajewski to lie during a police investigation, also intended to induce him to give false testimony or to withhold testimony on the ground that she ''believ[ed] that an official proceeding [was] . . . about to be instituted . . . .''[2] General Statutes § 53a-151 (a). The state argues that a jury reasonably could have inferred that, when the defendant attempted to induce Rajewski to

[1] No one contends that Rajewski actually testified falsely or withheld testimony, so the allegation is limited to the intent element of *attempting* to induce false testimony.

[2] No one contends that an ''official proceeding'' was pending at the time the police interviewed any of the witnesses in the present case.

State *v.* Lamantia

lie to Baker during the investigation into the incident, she also intended to induce him to "testify falsely" or to "withhold testimony" at an official proceeding that was about to be instituted. The defendant argues that, to prove she had the specific intent to induce Rajewski to give false testimony or to withhold testimony, the state would have been required to "prove a chain of likelihoods." According to the defendant, that chain of likelihoods would have required the state to present evidence that she thought that the police would charge Rajewski with a crime, that an official proceeding would be held, and that Rajewski would testify at an official proceeding. On the basis of this court's interpretations of §§ 53a-151 (a) and 53a-155, and the legislative history surrounding those statutes, I agree with the defendant that the legislature did not intend to criminalize her conduct in the present case, in which the chain of likelihoods necessary to satisfy the statutory requirements is so tenuous.

The majority explains that the state had to demonstrate beyond a reasonable doubt the two elements of the crime: (1) the defendant's belief that an official proceeding was about to be instituted, and (2) the defendant's attempt to induce Rajewski to testify falsely at an official proceeding.

I

I begin with the first element—the defendant's belief that an official proceeding was about to be instituted. Our legislature has defined an "official proceeding" as "any proceeding held or which may be held before any legislative, judicial, administrative or other agency or official authorized to take evidence under oath, including any referee, hearing examiner, commissioner or notary or other person taking evidence in connection with any proceeding." General Statutes § 53a-146 (1).

State *v.* Lamantia

Unlike § 241.6 (1) of the Model Penal Code,[3] our witness tampering statute, § 53a-151 (a), does not explicitly extend to interference with an "investigation . . . ." *State* v. *Ortiz*, 312 Conn. 551, 568, 93 A.3d 1128 (2014). This is not the first time we have been confronted with the question of under what circumstances a jury may find that, at the investigative stage, a defendant subjectively believes that an official proceeding is "about to be instituted . . . ." General Statutes § 53a-151 (a). Therefore, "we do not write on a clean slate, but are bound by our previous judicial interpretations of the language and the purpose of the statute." *Kasica* v. *Columbia*, 309 Conn. 85, 93–94, 70 A.3d 1 (2013).

We recently analyzed § 53a-151 in *State* v. *Ortiz*, supra, 312 Conn. 555, in which the defendant was a " 'principal suspect' " in a murder investigation. During their investigation, the police contacted Kristen Quinn, the defendant's former girlfriend, who, at first, did not provide the police with any useful information and who, after the victim's remains were found, told the defendant that she was in contact with the police and did not want to be involved with him because she thought he might have had something to do with the victim's murder. Id. In the following months, however, the defendant became aware that Quinn had been speaking with the police, and he detailed for her how he had killed the victim with a knife. Id., 557. Later, still, the defendant went to Quinn's house, showed her a handgun and told her that he "had the gun for insurance if she told the cops about what he said about [the victim]." (Internal quotation marks omitted.) Id. The defendant said that, if Quinn spoke to the police, "[her] house was going to go up in smoke." (Internal quotation marks omitted.) Id. He told her "that he was going to put [her down] on [her] knees, put the gun to [her] head and scare

[3] See 2 A.L.I., Model Penal Code and Commentaries (1980) § 241.6 (1), p. 162 (witness tampering extends to any person who believes "that an official proceeding or investigation is pending or about to be instituted").

State *v.* Lamantia

[her] straight.'' (Internal quotation marks omitted.) Id. The defendant also stated that he knew where Quinn's grandparents lived. Id. A jury found the defendant guilty of tampering with a witness in violation of § 53a-151 (a), as well as other charges. Id., 553–54.

The defendant appealed to this court, and we addressed his claim that § 53a-151 does not criminalize the act of attempting to prevent someone from giving a statement to the police when no charges are pending. Id., 559. We set forth the statute's two requirements: (1) the defendant ''believes that an official proceeding is pending or about to be instituted,'' and (2) ''the defendant induces or attempts to induce a witness to engage in the proscribed conduct.'' Id., 562. In applying the statute's first requirement to the facts in *Ortiz*, we referred to the phrase, ''about to be instituted,'' as ''somewhat ambiguous'' and sought to resolve that ambiguity by looking to our cases that interpret identical language in § 53a-155. Id., 569–70. We recognized that ''the omission of 'investigation' [in § 53a-151 (a)] was intended to exclude from the scope of the statute situations in which the defendant believes that only an investigation, but not an official proceeding, is likely to occur.'' Id., 570.

Nevertheless, we recognized that a defendant's interference with a witness during the investigation of a crime may violate § 53a-151 (a) if there was sufficient evidence that, at the time of the interference, the defendant (1) believed that an official proceeding was pending or was about to be instituted, and (2) interfered with the witness in the investigation so as to induce or to attempt to induce the witness to engage in the proscribed conduct (i.e., testify falsely, withhold testimony, elude legal process or absent himself from any official proceeding). Id., 560. Although attempting to induce a witness to lie to or to withhold evidence from police investigators may not always itself satisfy the

State *v.* Lamantia

subjective intent requirement of § 53a-151 (a), i.e., "believing that an official proceeding is pending or about to be instituted,"[4] we held that, under certain circumstances, a jury may infer that intent from the defendant's attempts to induce the witness to lie or to withhold that evidence. *State* v. *Ortiz*, supra, 312 Conn. 563. Applying that framework, we concluded that there was sufficient evidence that the defendant intended to induce a witness to testify falsely or to withhold testimony at an official proceeding by attempting to induce a witness to lie to the police. Specifically, we held that the jury could have inferred that, by interfering with the police investigation, the defendant intended to influence Quinn to lie during an official proceeding on the basis of evidence that the defendant had confessed to two individuals that he had killed someone, he knew Quinn was in contact with the police, and he had heard that warrants had issued for his arrest. Id., 572–73.

As we noted in *Ortiz*, § 53a-151 (a) is not the only criminal statute that punishes interference with our system of justice or that employs the phrase, "believing that an official proceeding is pending or about to be instituted . . . ." Nor is *Ortiz* the only recent decision of this court interpreting and applying that phrase. *Ortiz* was argued at the same time as *State* v. *Jordan*, 314 Conn. 354, 102 A.3d 1 (2014), although *Jordan* was

---

[4] We noted in *Ortiz* that, "[a]lthough the statute does not specify whether the term 'belief' is judged by an objective or subjective standard, this court previously has determined that the statute 'focuses on the mental state of the perpetrator to distinguish culpable conduct from innocent conduct.' " *State* v. *Ortiz*, supra, 312 Conn. 569, quoting *State* v. *Cavallo*, 200 Conn. 664, 669, 513 A.2d 646 (1986). Thus, § 53a-151 (a) applies to "any conduct that is intended to prompt a witness to testify falsely or refrain from testifying in an official proceeding that *the perpetrator believes* [is] pending or imminent." (Emphasis added.) *State* v. *Cavallo*, supra, 668. "Put simply, under § 53a-151 (a), as long as the defendant believes that an official proceeding will probably occur, it does not matter whether an official proceeding is actually pending or is about to be instituted." (Emphasis omitted.) *State* v. *Ortiz*, supra, 569.

State *v.* Lamantia

decided four months after *Ortiz*. In *Jordan*, we interpreted identical language from a related statute, § 53a-155,[5] which criminalizes tampering with physical evidence, not witnesses.

Like the defendant in *Ortiz*, the defendant in *Jordan* argued that the legislature had restricted the scope of the tampering with physical evidence statute, § 53a-155, by omitting from it the word "investigation." Id., 381. In *Jordan*, a police officer had chased a bank robbery suspect who ran down a sidewalk when the officer called out to him. Id., 359. One witness testified to having seen a man who matched the description of the individual remove his jacket while running across the witness' backyard. Id., 359–60. A second witness saw the individual remove his sweatshirt while he was in her backyard, after which the individual headed to the back of her carport, where the witness' husband later found a sweatshirt that was crumpled into a ball. Id., 360. The second witness also located a dark jacket in a neighbor's trash can, and, when the police took the jacket from the trash can, they also discovered a mask, leather gloves and a shopping bag. Id. DNA analysis of the samples that the police took from all of the items of clothing, except a sample that was taken from the collar of the jacket, included the defendant as a contributor of DNA. Id., 363. A jury found the defendant guilty of, among other crimes, tampering with physical evidence in violation of § 53a-155. Id., 364.

___

[5] At the time of the events in *Jordan*, § 53a-155 (a) provided: "A person is guilty of tampering with or fabricating physical evidence if, *believing that an official proceeding is pending, or about to be instituted*, he: (1) Alters, destroys, conceals or removes any record, document or thing with purpose to impair its verity or availability in such proceeding; or (2) makes, presents or uses any record, document or thing knowing it to be false and with purpose to mislead a public servant who is or may be engaged in such official proceeding." (Emphasis added.) General Statutes (Rev. to 2007) § 53a-155 (a).

State *v.* Lamantia

We "agree[d] with the defendant that the legislature restricted the scope of the tampering with physical evidence statute by omitting the word 'investigation.' We disagree[d] with the defendant, however, that [our previous case law had] improperly extend[ed] liability under the evidence tampering statute to conduct that the legislature deliberately excluded from the scope of § 53a-155." Id., 381. As in *Ortiz*, we concluded in *Jordan* that a defendant's attempt to discard evidence during the investigation of a crime may violate the evidence tampering statute, notwithstanding the omission of the word "investigation." Id., 382; see footnote 5 of this opinion. We explained in *Jordan* that the omission of the word "investigation" from the tampering with physical evidence statute did not automatically exclude all physical evidence discarded during a police investigation. *State* v. *Jordan*, supra, 314 Conn. 382. Rather, the statute's application depended on the point in time at which the defendant believed that an official proceeding probably would occur. Id. We emphasized "that it is not the existence of an investigation that is key but, rather, *whether the defendant believes* an official proceeding is pending or probable." (Emphasis added.) Id., 383.

Applying those principles in *Jordan*, we concluded that "the jury could not reasonably have concluded that the defendant believed that an official proceeding against him was probable when he discarded the evidence." Id., 385. The defendant had run within minutes of the attempted bank robbery, and there was no evidence that he believed that the police officer knew his identity or any other information connecting him to the crime. Id., 386. "[A]t that point in time, the clothing was the *only* evidence linking the defendant to the attempted bank robbery. Therefore, it would [have been] unreasonable for the jury to have inferred from the fact that the defendant absconded from the police officer that the defendant [had] believed that an official

State *v.* Lamantia

proceeding against him was probable.'' (Emphasis in
original.) Id. We concluded that the evidence was insuf-
ficient to support the conviction of tampering with phys-
ical evidence in violation of § 53a-155. Id., 388. ''Instead,
the only reasonable inference from the facts . . . [was]
that the defendant discarded his clothing to prevent its
use in an investigation in order to escape detection and
avoid being arrested by the pursuing police officer.''
Id., 388–89.

In both *Ortiz* and *Jordan*, therefore, we determined
that, despite the omission of the term ''investigation,''
both statutes could encompass interference with a
police investigation but only if there was proof beyond
a reasonable doubt that the defendant *subjectively*
''believed'' that an ''official proceeding [was] pending
or about to be instituted,'' i.e., ''that an official proceed-
ing will probably occur.'' In *Ortiz*, we concluded that
there was sufficient evidence of such a belief; in *Jordan*,
we concluded that there was not.

After our decisions in *Ortiz* and *Jordan*, the legisla-
ture, in Public Acts 2015, No. 15-211, § 9 (P.A. 15-211),
amended § 53a-155 but chose not to amend § 53a-151
(a). See, e.g., *Achillion Pharmaceuticals, Inc.* v. *Law*,
291 Conn. 525, 535, 970 A.2d 57 (2009) (''[t]he legislature
is presumed to be aware and to have knowledge of all
existing statutes and the effect which its own action
or nonaction may have on them'' (internal quotation
marks omitted)). I find the legislature's actions—both
the enactment of new language in § 53a-155 and the
lack of that language in the related statute, § 53a-151
(a)—relevant to an appropriate analysis under § 1-2z. I
consider the legislature's actions even more relevant,
given that, when we interpreted § 53a-151 (a) in *Ortiz*,
we were guided by the language of § 53a-155, before that
statute had been amended. See *State* v. *Ortiz*, supra,
312 Conn. 569–70; see also P.A. 15-211, § 9.

780 JUNE, 2021 336 Conn. 747

State *v.* Lamantia

"When construing a statute, [o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . In other words, we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of [the] case . . . . In seeking to determine that meaning . . . [General Statutes] § 1-2z directs us first to consider the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered." (Internal quotation marks omitted.) *Callaghan* v. *Car Parts International, LLC*, 329 Conn. 564, 570–71, 188 A.3d 691 (2018). Because we have previously construed § 53a-151 (a), "we must consider its meaning in light of our prior cases interpreting the statute . . . ." Id., 571. "When a statute is not plain and unambiguous, we also look for interpretive guidance to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and [common-law] principles governing the same general subject matter . . . ." (Internal quotation marks omitted.) *State* v. *Panek*, 328 Conn. 219, 225–26, 177 A.3d 1113 (2018).

In *Ortiz*, we considered the phrase, "about to be instituted," to be "somewhat ambiguous . . . ." (Internal quotation marks omitted.) *State* v. *Ortiz*, supra, 312 Conn. 569. Even after our construction of the term in a number of cases, however, I do not find this ambiguity entirely dispelled, given the legislature's addition of the term "investigation" in one statute, § 53a-155, and its failure to add it to the related statute at issue in the present case, § 53a-151 (a). Specifically, after the legislature's direct response to *Jordan* by amending § 53a-155, we are left with ambiguity as to how broadly or narrowly the legislature intended "official proceeding"

State *v.* Lamantia

to be construed under § 53a-151 (a). See *Amaral Bros.,
Inc.* v. *Dept. of Labor*, 325 Conn. 72, 89, 155 A.3d 1255
(2017) ("it is at least ambiguous whether the legislature,
in amending [General Statutes] § 31-60 (b) in 1980,
intended to repeal [a Department of Labor regulation]").
In my view, it is unclear whether the legislature intended
the language of § 53a-151 (a)—in the absence of the term
"investigation"—to apply to the interference with an
investigation under circumstances such as those in the
present case. Therefore, I would turn to the legislative
history. In the legislative session directly following *Jordan*, the Judiciary Committee considered Raised Bill
No. 1105, "An Act Concerning Minor Revisions to the
Criminal Justice Statutes." Raised Bill No. 1105, 2015
Sess., §§ 9 through 11. The proposed legislation included
amendments to the witness tampering statute (§ 53a-
151), the witness intimidation statute (General Statutes
(Rev. to 2015) § 53a-151a), and the evidence tampering
statute (§ 53a-155).[6] The proposal would have added

---

[6] The proposed amendments in §§ 9 through 11 of Raised Bill No. 1105
are as follows. We note that, within the following quoted material, proposed
additions are indicated by underlining and proposed deletions are enclosed
in brackets.

"Sec. 9. Section 53a-151 of the general statutes is repealed and the following is substituted in lieu thereof (*Effective October 1, 2015*):

"(a) A person is guilty of tampering with a witness if, believing that an
investigation or official proceeding is pending or about to be instituted, [he]
such person induces or attempts to induce a witness to testify or inform
falsely, withhold testimony, information, a document or a thing, elude legal
process summoning [him] such person to testify or provide evidence, or
absent himself or herself from any official proceeding or investigation to
which such person has been summoned.

＊ ＊ ＊

"Sec. 10. Section 53a-151a of the general statutes is repealed and the
following is substituted in lieu thereof (*Effective October 1, 2015*):

"(a) A person is guilty of intimidating a witness when, believing that an
investigation or official proceeding is pending or about to be instituted,
such person uses, attempts to use or threatens the use of physical force
against a witness or another person with intent to (1) influence, delay
or prevent the testimony of the witness in the official proceeding, or the
cooperation of the witness in the investigation, or (2) induce the witness
to testify or inform falsely, withhold testimony, information, a document or

State *v.* Lamantia

the term "investigation" to all of the statutes. See id. The amendment to the witness tampering statute also would have criminalized the inducement of an individual to "inform falsely" and to withhold "information" during an investigation. Id., § 9.

The Office of Legislative Research summarized the proposed amendments to the statutes by stating that "[t]he bill expands the scope of these crimes to cover conduct that occurs when a person believes an investigation is pending or about to begin. By law, each of these crimes covers conduct when a person believes an official proceeding is pending or about to begin. The Connecticut Supreme Court ruled that the evidence tampering crime did not cover situations where a person believes that only an investigation but not an official proceeding is likely (*State* v. *Jordan*, 314 Conn. 354 (2014))." Office of Legislative Research, Bill Analysis, S. Bill No. 1105: An Act Concerning Revisions to the Criminal Justice Statutes (2015), available at https:// www.cga.ct.gov/2015/BA/2015SB-01105-R000741-BA.htm.

Both the Office of the Chief Public Defender (OCPD) and the Connecticut Criminal Defense Lawyers Association (CCDLA) opposed the proposed amendments and submitted written testimony identifying concerns about the inclusion of the term "investigation." See Conn.

a thing, elude legal process summoning the witness to testify or provide evidence, or absent himself or herself from the official proceeding or investigation to which such person has been summoned.

\* \* \*

"Sec. 11. Section 53a-155 of the general statutes is repealed and the following is substituted in lieu thereof (*Effective October 1, 2015*):

"(a) A person is guilty of tampering with or fabricating physical evidence if, believing that an investigation or official proceeding is pending, or about to be instituted, [he] such person: (1) Alters, destroys, conceals or removes any record, document or thing with purpose to impair its verity or availability in such investigation or proceeding; or (2) makes, presents or uses any record, document or thing knowing it to be false and with purpose to mislead a public servant who is or may be engaged in such investigation or official proceeding."

State *v.* Lamantia

Joint Standing Committee Hearings, Judiciary, Pt. 9, 2015 Sess., pp. 4947–50. The CCDLA warned: "This bill will create scenarios in which parents, friends or associates of witnesses arguably would engage in 'tampering' behavior simply by discussing whether or not the witness should provide a statement to the police or otherwise cooperate with an ongoing investigation. If passed, this proposal will isolate witnesses and enable law enforcement to improperly exert pressure not only on the witnesses but on their families, friends and associates as well." Id., p. 4950, remarks of Elisa L. Villa, president of the Connecticut Criminal Defense Lawyers Association.

The OCPD posed a different scenario: "Assume for instance the following facts: a child age [fifteen] attends a school where there was a confrontation between other students. The [fifteen] year old was not involved but may have observed the confrontation. The [fifteen] year old is walking home from school, is stopped by the police and asked what he saw. The [fifteen] year old is afraid to talk to the police and does not provide any information. When he goes home and tells his parents what transpired, the parents tell him not to speak with anyone about the incident until they consult with an attorney. Are the parents telling this 'witness' to withhold information and therefore can [the parents] be charged with tampering with a witness?" Id., pp. 4947–48, remarks of Deborah Del Prete Sullivan, legal counsel to and director of the Office of the Chief Public Defender.

The proposal that the legislature ultimately enacted amended the tampering with or fabricating physical evidence statute to encompass such interference when a person believes a "criminal investigation conducted by a law enforcement agency" is pending, not just when a person believes an official proceeding is pending or about to be instituted. P.A. 15-211, § 9.[7] The legislature

_____

[7] Section 9 of P.A. 15-211, which amended General Statutes (Rev. to 2015) § 53a-155, provides in relevant part: "(a) A person is guilty of tampering

State *v.* Lamantia

did not amend either the witness intimidation statute
or the witness tampering statute, however.

Because the legislature enacted the amendment to
§ 53a-155 to include pending *investigations*, we can
infer that, in response to *Jordan*, the legislature acted
to criminalize conduct that we had not previously inter-
preted the statute to include—specifically, tampering
with evidence during a criminal investigation, without
the need to prove that the defendant believed an official
proceeding "would probably occur . . . ." *State* v.
*Ortiz*, supra, 312 Conn. 570. A rational reason to explain
this expansion is that physical evidence could be the
only evidence relied on to solve crimes. If physical evi-
dence is destroyed or altered early enough in the investi-
gation stage, the crime could remain unsolvable indefi-
nitely.

Conversely, the legislature did not amend the tamper-
ing with a *witness* statute, § 53a-151, to include the
inducement of another to inform falsely or to withhold
information when a person believes only that an investi-
gation is pending. From this, we can infer that the legisla-
ture did not reject our interpretation in *Ortiz*, leaving
*Ortiz* in place as good law, and did not intend to expand
the scope of the tampering with a witness statute to the
same degree as it expanded the scope of the tampering
with physical evidence statute. See, e.g., *State* v. *Evans*,
329 Conn. 770, 807, 189 A.3d 1184 (2018) ("[t]he legisla-
ture is presumed to be aware of the [courts'] interpreta-

with or fabricating physical evidence if, believing that <u>a criminal investigation</u>
<u>conducted by a law enforcement agency or</u> an official proceeding is pending,
or about to be instituted, [he] <u>such person</u>: (1) Alters, destroys, conceals
or removes any record, document or thing with purpose to impair its verity
or availability in such <u>criminal investigation or official</u> proceeding; or (2)
makes, presents or uses any record, document or thing knowing it to be
false and with purpose to mislead a public servant who is or may be engaged
in such <u>criminal investigation or</u> official proceeding. . . ."

 Additions to § 53a-155 (a) are indicated by underlining and deletions are
enclosed in brackets.

State *v.* Lamantia

tion of a statute and . . . its subsequent nonaction may be understood as a validation of that interpretation''), cert. denied, U.S. , 139 S. Ct. 1304, 203 L. Ed. 2d 425 (2019).

Having construed the statute and ascertained the legislature's apparent intent regarding the witness tampering statute, I must determine whether the statute applies to the facts of the present case, construing the record in the light most favorable to sustaining the verdict. See, e.g., *State* v. *Elmer G.*, 333 Conn. 176, 183, 214 A.3d 852 (2019). In my view, we must evaluate the defendant's conduct in relation to *Ortiz* and *Jordan*, as well as in relation to the conduct contemplated by the legislature when it considered amending the tampering statutes. These judicial and legislative guideposts make clear to me that the legislature, by not adopting the amendment to the witness tampering statute, did not intend to criminalize interference with every investigation and, specifically, did not intend to criminalize the inducement of others to withhold information or to falsely inform when there is no evidence to support an inference that, at *that* time, the individual also intended to attempt to influence such behavior in a future official proceeding. Rather, the legislature restricted application of the statute to conduct that the tamperer would have believed would induce *false testimony* or the *withholding of testimony* during an *official proceeding*—the intent requirements set forth in *Ortiz*.

First, in *Ortiz*, we discussed two contrasting scenarios by which to evaluate tampering conduct. See *State* v. *Ortiz*, supra, 312 Conn. 570–71. In one scenario, a person who committed a crime prevents the only witness to that crime from speaking to the police. Id., 570. The interference is undertaken to hinder the investigation and to prevent an official proceeding *against himself* from ever taking place. Id. Under *Ortiz*, that conduct would not fall within the scope of the statute. Id.

State *v.* Lamantia

("[t]he individual certainly could believe that the police
would investigate the crime, but he would have no rea-
son to believe that an official proceeding would proba-
bly occur because there would be no evidence or wit-
nesses on which the police could rely to identify and
arrest [him]"). Id. In the other scenario, the potential
tamperer knows that there is significant evidence con-
necting him to the crime and tampers with a witness
who has information relevant to that crime. Id., 570–71.
Under *Ortiz*, that conduct would fall within the purview
of the statute because the conduct suggests an intent
to induce that witness to testify falsely or to withhold
evidence. Id., 571.

Although not dispositive, the facts of the present case
clearly fall closer to the first scenario than the second.
The defendant was not involved in the altercation and
had no reason to believe that an official proceeding
would probably occur because there was no evidence
or witness tying her to a criminal role in the altercation.
She was not the alleged perpetrator of the crime; nor
did she witness the incident. Some evidence suggests
that someone might have inferred that an official pro-
ceeding *could* be instituted (the defendant was on the
scene when the police arrived, heard Moulson recount
his version of events to Baker and knew that one parti-
cipant had been taken to the police station). But the
record is devoid of evidence—and surely not evidence
beyond a reasonable doubt—that the defendant in fact
*believed* that an official proceeding was about to be
instituted, i.e., "would probably occur . . . ." Id., 570.
But cf. id., 572–73 ("there was substantial evidence on
which the jury could have relied to find that the defen-
dant believed an official proceeding would probably
occur," including the defendant's confessions, his con-
tacts with the police, his request to speak to an investi-
gator working on the case, and his statements that he
had heard about warrants for his arrest); *State* v.

*Cavallo*, 200 Conn. 664, 673, 513 A.2d 646 (1986) (state
"introduced ample evidence to convince a reasonable
finder of fact that, at the time of his attempts to [induce
a false account from a witness] . . . the defendant had
known that an arbitration proceeding would soon be
pending and that, during the hearing, the [witness]
would probably be called to testify''); *State* v. *Pommer*,
110 Conn. App. 608, 620, 955 A.2d 637 (The state pre-
sented evidence that the "defendant knew that [an indi-
vidual] had turned herself in to the police and had impli-
cated [the defendant and two others] in the robbery.
From this evidence, the jury reasonably could have
inferred that the defendant believed that an official
proceeding was about to be instituted.''), cert. denied,
289 Conn. 951, 961 A.2d 418 (2008). It is true of every
investigation that a witness who seeks to interfere will
have *some* information about the incident under investi-
gation. Simply knowing about a crime and attempting
to prevent the police from discovering more about what
transpired does not, in and of itself, constitute witness
tampering. In my view, the defendant's mere knowledge
of participants' *involvement* in a potential crime under
investigation is hardly a sufficient limitation on the
scope of the statute, as it would virtually always impute
to the defendant a *belief* that an official proceeding is
about to be instituted. Importantly, both scenarios in
*Ortiz* contemplate a tamperer who is acting to prevent
inculpatory evidence about a crime *the tamperer him-
self* had committed from reaching the police and, ulti-
mately, from reaching a jury.

We know from *Ortiz* that the legislature did not
intend to criminalize all interferences with investiga-
tions. Missing from the record in the present case is
the type of evidence—and, more particularly, the defen-
dant's awareness of that evidence—indicating that an
official proceeding "probably would occur . . . .'' *State*
v. *Ortiz*, supra, 312 Conn. 570. Had her plan succeeded,

State *v.* Lamantia

no official proceeding would have ever ensued, undermining the argument that she believed an official proceeding was about to be instituted.

In this way, the facts of the present case no more support a conclusion that the defendant believed an "official proceeding . . . [was] about to be instituted"; General Statutes § 53a-151 (a); than did the facts of *Jordan*, and are perhaps more attenuated. Unlike the tamperer in *Jordan*, the defendant in the present case was not the target of the investigation. She did not engage in the altercation under investigation, although she knew the participants. It was not clear whether any one or all of the participants would be arrested that night, let alone that there would be a trial. "Instead, the only reasonable inference from the facts . . . [was] that the defendant [urged Rajewski to bloody his clothes and to get his story straight] in order [for Rajewski] to escape detection and avoid being arrested by the pursuing police officer." *State* v. *Jordan*, supra, 314 Conn. 388–89. In my view, it was therefore unreasonable for the jury to have inferred from the fact that the defendant urged Rajewski to deceive the officer that she subjectively believed "that an official proceeding against him was probable." Id., 386.

II

In light of my conclusion that the legislature did not intend to criminalize the inducement of false testimony or the withholding of testimony during an investigation unless the evidence supports an inference that the defendant subjectively believed that an official proceeding would probably occur, it becomes clear that the state bore a heavy burden to satisfy the second element of the crime—that the defendant intended to attempt to induce false testimony at an official proceeding. In addition to the fact that, as discussed, I do not believe this is a case in which the state can demonstrate that the defendant believed an official proceeding was about

to be instituted, given my understanding of the scope of the statute, I also do not believe that the state met its burden of proving that, on the evening in question, she attempted to convince Rajewski to testify falsely at a future proceeding.

The statute's legislative history contains another guidepost by which we can evaluate whether the legislature intended for the defendant's conduct to come within the second element of the statute—intent to attempt to induce false testimony. In its written testimony about Raised Bill No. 1105, which would have modified all three statutes; see part I of this opinion; the CCDLA warned that expansion of the tampering statute could criminalize friends or associates of witnesses who engage in tampering behavior simply by discussing whether the witness should provide a statement to the police or otherwise cooperate with an ongoing investigation. See Conn. Joint Standing Committee Hearings, supra, p. 4950. In these scenarios, the potential tamperer is not at all involved as a participant in the crime under investigation but only becomes involved by telling a witness to withhold information from the police. The potential tamperer is also not subject to any criminal charges resulting from the investigation, other than a charge of tampering. The tamperer does not stand to benefit personally from the withholding of information. The tamperer's immediate intent, then, is to withhold information from the police to protect someone else from getting into trouble or from being arrested.

Nothing in the record suggests, like the scenario that the CCDLA warned of, that the defendant in the present case was attempting to induce Rajewski to lie *at an official proceeding*. Unlike the defendants in *Ortiz* and *Jordan, s*he was not a suspect in the crime the police were investigating. She did not face potential prosecution in connection with the fight that took place. When

State *v.* Lamantia

the investigating officer, Baker, was asked during trial, "what was the effect of her text messages on your investigation," he responded, "[w]ell, when I left the scene . . . I had no reason to arrest her . . . she was being honest with me. . . . I had to arrest her now. She's trying to get someone to lie to me; that's interfering with my investigation." The defendant did not stand to benefit from information being withheld from the police other than by keeping her boyfriend from being prosecuted. That intent is exactly what the legislature declined to criminalize by not extending § 53a-151 to include interference with *investigations*—conduct that would be considered within § 53a-155 after the legislature's 2015 amendment. See P.A. 15-211, § 9.

This is not to say that a witness tampering charge is appropriate *only* when the tamperer stands to benefit personally by avoiding criminal charges or *only* when the tamperer is a witness to the underlying crime. I acknowledge that, under certain circumstances, an individual who is not involved in the crime and does not witness the crime certainly could be subject to a tampering charge. The Appellate Court examined that exact situation in *State* v. *Bennett-Gibson*, 84 Conn. App. 48, 851 A.2d 1214, cert. denied, 271 Conn. 916, 859 A.2d 570 (2004). In *Bennett-Gibson*, the defendant's sister offered the alleged victim-witness financial incentives to drop the case against her brother. Id., 50. What distinguishes *Bennett-Gibson* from the present case is that the tamperer in *Bennett-Gibson* approached the witness in the courthouse *after* the witness had lodged a formal complaint with the police and *after* the brother had been arrested and charged—all evidence establishing that an official proceeding had begun and that the tamperer intended to influence testimony at that proceeding. Id. *Bennett-Gibson* clearly illustrates the point that, once the official proceeding has begun, the tamperer knows it has begun, and the damaging testimony is looming large at that proceeding; interference even

State *v.* Lamantia

by a third party may reasonably be inferred to demonstrate an intent to influence or prevent that testimony, thereby supporting a tampering charge. In the absence of evidence of at least an incipient proceeding, and more particularly the defendant's subjective belief that the proceeding was about to begin, an inference of the necessary intent remains legally tenuous.

In an attempt to bolster the state's plainly deficient proof of the defendant's intent on the night in question to induce Rajewski's false testimony at a future proceeding—which is what she was charged with and which I believe fails as a matter of legislative intent and evidence—the majority relies on the defendant's *own* testimony at her *own* trial in her *own* defense sixteen months later. From this, the majority undertakes a leap of logic: that "the jury reasonably could have concluded that the defendant had no qualms about perjuring herself on the witness stand and, from such a finding, could have inferred, in light of all the other evidence, that the defendant intended Rajewski to do the same when the time came."

I agree with the majority that, on the basis of her testimony as well the evidence presented by the state to rebut that testimony, the jury reasonably could have concluded that the defendant was "dishonest and not credible . . . ." For example, it could have concluded that the defendant lied when she testified that she did not send the text messages to Rajewski at all or that someone else had sent them. She also lied when she denied she was in a relationship with Rajewski at the time of the altercation with Moulson. And she lied once again when she insisted she was not in love with Rajewski at the time of the altercation or afterward. As is often the case these days, she was effectively hoisted on her own social media postings,[8] claiming, as with

_____

[8] The defendant's Facebook account contained the following, which was admitted into evidence at trial: "I love [Rajewski] with all my heart and would do anything for him! I'm sure u know he just broke up with me. I'm

State *v.* Lamantia

the text messages, they either were sent from a fake
account or that her account had been hacked. The
majority therefore makes a convincing case that she
was an unrepentant perjurer.

I am a firm believer in our often stated admonition
that the line between fair inference and improper specu-
lation is, "frankly, a matter of judgment," and that it is
not my role to substitute my own view for the jury's
exercise of that judgment. (Internal quotation marks
omitted.) *State* v. *Rhodes*, 335 Conn. 226, 238,      A.3d
(2020). The defendant, after all, chose a jury trial.
But the majority would have us conclude that the jury
reasonably could have inferred from the fact that she
testified falsely at her own trial, long after Baker's inves-
tigation of the altercation between Rajewski and Moul-
son, that she also intended by her actions all those
months before to induce *Rajewski* to testify falsely at
any later trial arising from the altercation. This is too
much for me.

Could the jury have come to the same conclusion—
that she is a liar—if she had lied about her hair color
or her age? Possibly, and yet, so what? How do those
lies bring her conduct within the scope of the statute?
The defendant's false testimony at her own trial is
hardly probative—and certainly not dispositive—of her
intent to attempt to induce Rajweski to lie at a different
official proceeding when she was trying to get him to
lie to the police on the evening in question.

The fundamental problem with the defendant's own
testimony is that it suffers from a double remoteness
problem. Under the majority's reasoning, the defen-

sure you know I lied and said I saw [Moulson] get out of his car and go
after [Rajewski] in court. . . . I'm sure u know I gave him 100 [percent] of
me and loved him unconditionally when he was at his worst! [A]nd would
give up everything I have to be with him! . . . [S]o I'm sure u know he
broke my heart . . . . [P]lease tell him I will be here waiting. [A]nd he's
my soulmate . . . . [H]e brought out the real me after being abused for
[seven] years . . . ."

State *v.* Lamantia

dant's false testimony in 2017 is projected back in time sixteen months to inform the defendant's intent on the night of the altercation in 2016, and that intent is then propelled forward to influence a future official proceeding, whenever it is held. Proving a defendant's intent to influence a future proceeding by having to demonstrate her subjective belief that that proceeding was about to be instituted is challenging enough. But while it is certainly appropriate to seek to prove the elusive element of intent on the basis of circumstantial evidence; see, e.g., *State* v. *Bonilla*, 317 Conn. 758, 766, 120 A.3d 481 (2015); in my view, using the circumstances of a defendant's *future* testimony to make out a case of an *earlier* intent to influence a *future* proceeding requires that the majority attempt a feat of elasticity that the state does not undertake on its own.

This is how the majority explains it: The defendant's perjury "undermines any suggestion that the defendant could not be presumed to have contemplated that Rajewski should lie at any trial that resulted from the police investigation of the altercation.'' ''[U]ndermin-[ing]'' a "suggestion" of the defendant's "presumed" "contemplat[ion]'' sixteen months beforehand hardly sounds like proof of an intent beyond a reasonable doubt. Quite simply, I disagree with the majority that the jury's determination of the defendant's credibility at her own trial in 2017 can serve to establish the statutory requirement of intent to attempt to induce false testimony at an official proceeding that, *at best*, may have been about to be instituted in 2016.

The jury reasonably could have inferred from the fact that the defendant lied at her own trial that she lies, especially for her own benefit; however, it could not reasonably infer from this evidence that she intended to induce another person to lie in an official proceeding that did not involve her. Lying, by itself, and outside of the perjury context, is not a crime. Additionally, telling someone else to lie to the police, without more, does

State *v.* Lamantia

not violate any criminal statute in Connecticut, as it would under federal law. See 18 U.S.C. § 1001 (a) (2018) ("whoever . . . (1) falsifies, conceals, or covers up by any trick, scheme, or device a material fact . . shall be fined . . . [or] imprisoned"). The legislative history tells us that the legislature did not intend to reach so far and that there must be some limit on the scope of the witness tampering statute. The limitation lies in requiring proof that the tamperer "believ[es] that an official proceeding is pending or about to be instituted" and "attempts to induce a witness to testify falsely . . . [in] any official proceeding." General Statutes § 53a-151 (a). In the absence of some evidence of belief and intent, the statute sweeps in the friend or parent who the CCDLA warned could be prosecuted for tampering, exclusively on the basis of a discussion of whether to provide a statement to the police or to cooperate with their investigation. See Conn. Joint Standing Committee Hearings, supra, p. 4950. I do not believe the legislature intended to criminalize such conduct.

I agree with the defendant that the chain of inferences required to get from the defendant's texting her boyfriend to lie to the police to intending to have her boyfriend lie while testifying during a trial is simply too tenuous to fall within the conduct that I conclude the legislature intended to criminalize. Moreover, "unless a contrary interpretation would frustrate an evident legislative intent, criminal statutes are governed by the fundamental principle that such statutes are strictly construed against the state." (Internal quotation marks omitted.) *State* v. *Cote*, 286 Conn. 603, 615, 945 A.2d 412 (2008). The majority's conclusion would expand the scope of the witness tampering statute beyond that of our decision in *Ortiz* and would, in my view, conflict with the legislature's rejection of the proposed amendment, which reinforced the view that the statute should not apply to every interference with an investigation.

State *v.* Lamantia

The statute and our case law demonstrate that an intent
to attempt to influence testimony can be inferred only
when the defendant subjectively believes that an official
proceeding is about to be instituted. The evidence in
the present case does not establish that the defendant
subjectively believed that an official proceeding proba-
bly would occur. The state failed to establish that sub-
jective belief, and the record is devoid of evidence to
establish that the defendant acted with the intent to
attempt to induce false testimony at a proceeding she
did not subjectively believe was about to be instituted.

Accordingly, I would reverse in part the judgment of
the Appellate Court and remand the case to that court
with direction to direct the trial court to render judg-
ment of not guilty on the charge of witness tampering.
I therefore respectfully dissent.

ECKER, J., dissenting. Our witness tampering statute,
General Statutes § 53a-151 (a), prohibits anyone who
believes "that an official proceeding is pending or about
to be instituted" from "induc[ing] or attempt[ing] to
induce a witness to testify falsely . . . ." The terms
"official proceeding," "witness," and "testify" each have
a well-known meaning in the law. The three terms,
working together in the same statutory provision, estab-
lish a clear legislative purpose to criminalize only words
or conduct intended to influence another person to
make a false sworn statement, or to desist from making
a true sworn statement, in an "official proceeding."
An "official proceeding" is statutorily defined as "any
proceeding held or which may be held before any legis-
lative, judicial, administrative or other agency or official
authorized to take evidence under oath, including any
referee, hearing examiner, commissioner or notary or
other person taking evidence in connection with any
proceeding." General Statutes § 53a-146 (1). A police
investigation plainly is not such a proceeding. Indeed,

State *v.* Lamantia

we previously have recognized that our witness tampering statute does not include "situations in which the defendant believes that only an investigation, but not an official proceeding, is likely to occur." *State* v. *Ortiz*, 312 Conn. 551, 570, 93 A.3d 1128 (2014); see id., 568 (agreeing "that the legislature restricted the scope of the witness tampering statute by omitting [the] words ['investigation,' 'inform,' and 'informant']"). Compare General Statutes § 53a-151 (a) (limiting witness tampering to any person who believes "that an official proceeding is pending or about to be instituted"), with 2 A.L.I., Model Penal Code and Commentaries (1980) § 241.6 (1), p. 162 (witness tampering extends to any person who believes "that an official proceeding *or investigation* is pending or about to be instituted" (emphasis added)).

The majority concludes that the evidence in the present case was sufficient for the jury to find beyond a reasonable doubt that the defendant intended to induce a witness to testify falsely in an official proceeding when she texted her on-again, off-again boyfriend, shortly after he had been in a physical altercation with her other on-again, off-again boyfriend, that they "needed to be on the same page" and "stick with the same story . . . ." I disagree. In light of the evidence before the jury and the state's theory of the case at trial, I believe that, although the evidence is sufficient to support a reasonable inference that the defendant intended to tamper with a suspect in *a police investigation*, it is insufficient to support a reasonable inference that she intended to tamper with a *witness* in an *official proceeding*. Because such conduct falls outside the scope of our witness tampering statute, I would reverse the judgment of the Appellate Court upholding the defendant's witness tampering conviction. Accordingly, I respectfully dissent. In doing so, I note my agreement with the well-reasoned dissenting opinion of Justice D'Auria.

State *v.* Lamantia

I

As both the Appellate Court and the majority recognize, "this case is replete with conflicting testimony regarding the timing and nature of the relationships between the various parties, as well as the events of the night of July 24, 2015, and the early morning of July 25, 2015. It was for the jury, and not [the] court, to resolve discrepancies in the testimony." *State* v. *Lamantia*, 181 Conn. App. 648, 650 n.1, 187 A.3d 513 (2018); accord footnote 3 of the majority opinion. The following facts, which the jury reasonably could have found, are construed in the light most favorable to sustaining the jury's verdict. See, e.g., *State* v. *Elmer G.*, 333 Conn. 176, 183, 214 A.3d 852 (2019).

The defendant was in, or recently had been in, a romantic relationship with Jason Rajewski at the same time that she also was romantically involved with David Moulson. The entanglement led to a confrontation between the two men. During the early morning hours of July 25, 2015, Moulson left a bar in Norwich to follow the defendant, Rajewski, and Earl F. Babcock to a house at 18 Bunny Drive in Preston. The undisputed testimony at trial established that Moulson had followed the defendant in the past using a tracking application installed on her cell phone.

Moulson arrived at 18 Bunny Drive at approximately 2:30 a.m. A physical altercation between Moulson, Rajewski, and Babcock immediately ensued. The incident took place in the driveway outside the house while the defendant was inside. The defendant did not observe the physical altercation and was unaware of its occurrence until she saw a bloodied Moulson running toward the house, with Rajewski and Babcock following behind him. The defendant informed Rajewski and Babcock that they should leave because Moulson was calling the police.

State *v.* Lamantia

Sometime after Rajewski left Bunny Drive, but before
Jonathan Baker, a Connecticut state trooper, arrived at
Rajewski's house to investigate the incident, the defen-
dant sent Rajewski a series of text messages. Unfortu-
nately, the text messages were not preserved or intro-
duced into evidence at the defendant's trial. In the
absence of this direct evidence, Baker described the
text messages for the jury, after refreshing his recollec-
tion by reviewing his police report, which itself was
never admitted into evidence.[1] According to Baker,[2] the
defendant's first text message to Rajewski "essentially
[said that] the cops are coming, make sure you're bloody
and . . . [that Moulson] is abusive to her." Rajewski
responded "okay." Baker informed the jury that the
defendant then sent another text message telling Rajew-
ski "[t]o wait outside because the police were coming.
Then she [told Rajewski that] he's going to stand by
her side and to delete the conversation." In her next
text message, Baker continued, the defendant instruc-
ted Rajewski to "tell the police . . . that [Moulson]
stalks her." Baker testified that "[the defendant] said
[Moulson] was bloody when he got there. [The defen-
dant] told [the troopers] that [Moulson] was in a bar
fight somewhere else. And . . . [Rajewski] only fol-
lowed [the defendant] to that residence [on Bunny
Drive] because he loves her." According to Baker,
"[e]ssentially, [the defendant was] telling [Rajewski]

[1] During its deliberations, the jury asked to review Baker's police report
but was informed that the report was "never presented as evidence during
the course of this trial and therefore . . . you are not entitled to review [it]."

[2] It is unclear at certain points in Baker's testimony whether he is reading
the text messages transcribed in his police report verbatim, summarizing
them, or interjecting his own opinions about their content and intended
purpose. To the extent that any ambiguity in the record exists, I resolve it
in the light most favorable to sustaining the jury's verdict. See, e.g., *State*
v. *Elmer G.*, supra, 333 Conn. 183 ("In reviewing a claim of insufficiency
of the evidence, we construe the evidence in the light most favorable to
sustaining the verdict. . . . We then determine whether the jury reasonably
could have concluded that the evidence established the defendant's guilt
beyond a reasonable doubt." (Citation omitted.)).

State *v.* Lamantia

that they need to stick with the same story and it would
be good. They have to match.''

Baker testified that Rajewski became upset and told
the defendant ''no, I'm telling the truth. [Moulson] tried
to kick my ass, so I beat him up. . . . [E]nough is
enough.'' Baker added that the defendant next texted
Rajewski ''a [question] mark'' and then the following
message: ''[Moulson's] ducked up. Your story has to
match mine. [Moulson] looks crazy. He deserves it
because of the beatings he's [done] to me.'' Baker con-
tinued: ''[The defendant was] telling [Rajewski] that
[Moulson] told [the police] that [Rajewski] attacked
[Moulson] in his car.'' Rajewski responded that ''there's
no story,'' and ''[Rajewski] essentially [got] angry with
[the defendant], now saying that [she had] brought
[Moulson] there for [Rajewski] to do that. She says [she]
didn't know.'' According to Baker, Rajewski texted the
defendant that he ''didn't know [Moulson] was going
to come out swinging like an idiot. [Rajewski] then
[texted the defendant] that he's not going to tell a story,
[that] he's just going to tell what happened. He—
rephrase. That was [the defendant] saying not the story,
just what I know, I saw nothing.'' Baker testified that
Rajewski then texted the defendant that ''the cops are
here now. And the last two [texts from the defendant
were sent] either while I'm talking to [Rajewski] or
while [Rajewski was] being processed.'' In those final
texts, the defendant asked Rajewski if ''he [took] the
keys'' and indicated that ''the truth is fine, but you two
[i.e., Rajewski and Moulson] are telling two different
stories, [and] you need to be on the same page.''

The state's legal theory at trial warrants mention
because it contains a fatal flaw that adumbrates the
evidentiary deficiency requiring reversal of the defen-
dant's witness tampering conviction. In its closing argu-
ment, the state informed the jury that, in order to find
the defendant guilty of tampering with a witness, the

State *v.* Lamantia

state need only prove that the defendant intended to tamper with a witness in *a police investigation.* The state argued that "the requirement of the defendant believing an official proceeding was about to be instituted can be satisfied if the defendant knew that she could have been implicated in a crime and she asked, threatened, or induced a witness to withhold evidence from [the] police. It does not matter that it was in the investigative phase of the criminal justice process. It doesn't matter that the police were still figuring out what happened. *It just matters that she intended to prevent that witness from speaking with* [*the*] *police or* [*from*] *telling the police the truth.*" (Emphasis added.) The state further argued that the defendant "[c]learly . . . knew that a proceeding ha[d] been instituted" and "[c]learly . . . knew an investigation was currently in [progress]" because she "knew the cops were involved" and she had spoken to the police. This theory of guilt was manifestly erroneous as a matter of law.

II

Two points require comment before addressing the case law construing our witness tampering statute and the requirement that the defendant specifically intend to induce false testimony in an "official proceeding." Both points relate to a troubling lack of focus in the state's theory of criminal wrongdoing at trial. First, the state never informed the jury precisely which statement or statements in the defendant's text messages either were false or sought to induce Rajewski to testify falsely; nor did it identify for the jury the "official proceeding" in which the defendant expected Rajewski's testimony would occur (e.g., the prosecution of Rajewski, Moulson or Babcock, or some combination thereof, for the crime of assault or breach of the peace, the infraction of creating a public disturbance, or some other charge). These are not minor deficiencies in a prosecution charging a defendant with tampering with

State *v.* Lamantia

a witness (i.e. attempting to induce a witness to testify falsely) in an official proceeding. Although I do not doubt that the evidence is sufficient to conclude that the defendant intended to promote an inaccurate version of events in *some* fashion, it is a matter of significant concern to me that the state failed to identify the specific falsehood or the specific proceeding serving as the basis of the witness tampering conviction.[3] It was the state's burden to prove beyond a reasonable doubt that the defendant intended to induce "false testimony," and, in order to fulfill that burden, the state had to prove the falsity of one or more statements that the defendant asked Rajewski to make to the police. Although the defendant's suggestion that she and Rajewski should "match" their "stories" to be "on the same page" certainly is suggestive of a desire to provide a false version of one or more facts, the state neglected to identify precisely what part or parts of the defendant's "story" were false or were intended to induce false testimony, just as it failed to identify the official proceeding with which the defendant intended to interfere. In light of the unfortunate lack of specificity pervading the defendant's trial in this case, we should exercise care on appeal to ensure that the evidence is sufficient to sustain a conviction under our witness tampering statute.

Second, the state erroneously informed the jury that a police investigation is an official proceeding, even though the statutory definition of an "official proceeding" plainly excludes police investigations. See General Statutes § 53a-146 (1). The state compounded this error by arguing that it had satisfied its burden of proof with respect to the defendant's belief that an official proceed-

---

[3] With respect to the purported falsity of the text messages, there was no evidence, for example, whether Moulson was abusive to the defendant, whether he stalked her, whether he had been in a bar fight earlier in the evening or whether he was bloody when he arrived at the house on Bunny Drive.

State *v.* Lamantia

ing was pending or imminent because it had established
that the defendant "knew the cops were involved" and,
therefore, "[c]learly . . . knew that a proceeding ha[d]
been instituted."[4] I recognize that the trial court prop-
erly instructed the jury on the essential elements of
the offense, but, nonetheless, neither the trial court,
defense counsel, nor the state corrected this egregious
misstatement of law. See *State* v. *Otto*, 305 Conn. 51,
77, 43 A.3d 629 (2012) ("prosecutors are not permitted
to misstate the law . . . and suggestions that distort
the government's burden of proof are likewise improper"
(citation omitted)). The state's reliance on an erroneous
legal theory informs my view of the facts that the jury
reasonably and logically could have found in the pres-
ent case.

### III

I begin my analysis with the language of our witness
tampering statute and the governing case law. Section
53a-151 (a) provides that "[a] person is guilty of tamper-

---

[4] For reasons that I discuss more fully in this opinion, I fundamentally
disagree with the majority that, when "[v]iewed in its entirety, the state's
closing argument relating to the witness tampering charge was not mis-
leading." Footnote 10 of the majority opinion. As the majority acknowledges,
the state's theory of the case was that the defendant knowingly tampered
with a witness in a police investigation and that such conduct, *standing
alone*, was sufficient to satisfy the state's burden to establish the defendant's
intent to interfere in an official proceeding. Our witness tampering statute,
however, deliberately excludes "situations in which the defendant believes
that only an investigation, but not an official proceeding, is likely to occur."
*State* v. *Ortiz*, supra, 312 Conn. 570. Although evidence that the defendant
was aware of the existence of a police investigation may, depending on the
attendant factual circumstances, support an inference that the defendant
intended to interfere with an official proceeding, the inferred fact regarding
the defendant's subjective belief is an essential element of the crime that
the state bears the burden of proving beyond a reasonable doubt. The
state's theory of the case at trial, like the majority's analysis in this appeal,
misconceives the state's burden of proof by treating mere knowledge of an
active police investigation as a substitute for the statutory requirement that
the defendant intend *to induce a witness to testify falsely in an official
proceeding*, contrary to the plain language, intent, and purpose of our witness
tampering statute, and contrary to controlling precedent.

State *v.* Lamantia

ing with a witness if, believing that an official proceed-
ing is pending or about to be instituted, he induces or
attempts to induce a witness to testify falsely, withhold
testimony, elude legal process summoning him to testify
or absent himself from any official proceeding.''[5] A ''wit-
ness'' is defined as ''any person summoned, or who may
be summoned, to give testimony in an official proceed-
ing.'' General Statutes § 53a-146 (6). An ''official pro-
ceeding'' is ''any proceeding held or which may be held
before any legislative, judicial, administrative or other
agency or official authorized to take evidence under
oath, including any referee, hearing examiner, commis-
sioner or notary or other person taking evidence in
connection with any proceeding.'' General Statutes
§ 53a-146 (1). ''Thus, the witness tampering statute has
two requirements: (1) the defendant believes that an
official proceeding is pending or about to be instituted;
and (2) the defendant induces or attempts to induce a
witness to engage in the proscribed conduct. These
requirements serve the purpose of part XI of the Con-
necticut Penal Code, in which § 53a-151 (a) is found,
as they punish those who interfere with the courts and
our system of justice.'' (Internal quotation marks omit-

---

[5] The word ''testify'' in § 53a-151 (a) is not defined in the definitional
section of part XI of our penal code; see generally General Statutes § 53a-
146; but, in this context—that is, when used in conjunction with the words
''witness'' and ''official proceeding''—the term manifestly refers only to
statements made *under oath*. See, e.g., *Sickle* v. *Torres Advanced Enterprise
Solutions, LLC*, 884 F.3d 338, 349–50 (D.C. Cir. 2018) (relying on dictionary
definition of testify: '' '[t]o make a declaration of truth or fact under oath' ''),
quoting The American Heritage Dictionary of the English Language (New
College Ed. 1976) p. 1330; *State* v. *Salafia*, 29 Conn. Supp. 305, 310, 284
A.2d 576 (1971) (*Shea, J.*) (''The power to compel 'testimony' imports the
power to require an oath of a witness, because the word is usually defined
as meaning oral statements of a person under oath. [Webster's Third New
International Dictionary (1961) p. 2362; Black's Law Dictionary (4th Ed.
1968) p. 1646].''); see also Black's Law Dictionary (11th Ed. 2019) p. 1778
(defining ''testimony'' to mean, inter alia, ''[e]vidence that a competent wit-
ness under oath or affirmation gives at trial or in an affidavit or deposition'');
cf. *State* v. *Taborsky*, 139 Conn. 475, 487, 95 A.2d 59 (1953) (''[t]estimony
given in court under oath is not in the same category as statements made
to police officers outside of court'').

State *v.* Lamantia

ted.) *State* v. *Ortiz*, supra, 312 Conn. 562. These two requirements are conjunctive and interactive—the criminal conduct consists of words or conduct exhibiting an intent to induce false testimony *in an official proceeding.* See id., 554 ("[b]ecause the jury reasonably could have found that the defendant believed that an official proceeding was about to be instituted and that [the prospective witness] probably would be called to testify at that proceeding, we conclude that the jury reasonably could have inferred that the defendant intended to induce [the witness] to testify falsely or to withhold testimony at that proceeding"). Thus, any charge of witness tampering, if based on efforts by a defendant to influence a witness during a criminal investigation prior to the commencement of any "official proceeding," must be supported by direct or circumstantial evidence reflecting the defendant's intent to influence the testimony of a "witness" in that future proceeding.

As we recognized in *State* v. *Ortiz*, supra, 312 Conn. 568, our witness tampering statute is based on § 241.6 (1) of the Model Penal Code, which provides in relevant part that "[a] person commits an offense if, believing that an official proceeding *or investigation* is pending or about to be instituted, he attempts to induce or otherwise cause a witness *or informant* to . . . testify *or inform* falsely . . . ." (Emphasis added.) Model Penal Code and Commentaries, supra, § 241.6 (1) (a), p. 162. When it enacted § 53a-151, our legislature purposefully omitted the words "investigation," "informant" and "inform" because it intended to exclude tampering with a witness in a police investigation from the scope of criminal culpability under that statute, unless the defendant has the specific intent to interfere with an "official proceeding." See *State* v. *Ortiz*, supra, 568; cf. *Heirs of Ellis* v. *Estate of Ellis*, 71 S.W.3d 705, 713–14 (Tenn. 2002) ("When the legislature enacts provisions of a uniform or model act without significant alteration, it may

State *v.* Lamantia

be generally presumed to have adopted the expressed
intention of the drafters of that uniform or model act.
. . . However, when the legislature makes significant
departures from the text of that uniform act, we must
likewise presume that its departure was meant to
express an intention different from that manifested in
the uniform act itself.'' (Citation omitted.)). Thus, § 53a-
151 plainly applies only when the defendant has the
specific ''intent to influence a witness' conduct at an
*official proceeding*.'' (Emphasis added.) *State* v. *Ortiz*,
supra, 554. *Ortiz* thus identifies a critical outer limit to
the reach of our witness tampering statute on the basis
of the operative text and legislative history.[6]

The issue presented in this appeal is whether the
evidence was sufficient to prove beyond a reasonable
doubt that the defendant had intended to influence
Rajewski's testimony in a future official proceeding
when she sent him the text messages following his
physical altercation with Moulson. To resolve this ques-
tion, and ''to distinguish culpable conduct from inno-
cent conduct''; (internal quotation marks omitted) id.,
569; the statute directs us to focus on the defendant's
state of mind rather than the actual status of the official
proceeding. The defendant's belief regarding the pen-
dency or imminence of an official proceeding is not
measured by ''temporal proximity'' but, rather, by
''probability of occurrence,'' because ''mere temporal
proximity does not sufficiently implement the goal of
punishing the obstruction of justice.'' Id.; see also Model
Penal Code and Commentaries, supra, § 241.6, com-
ment 2, pp. 166–67 (''The prosecution must establish
that the defendant held the specified belief but need
not prove that a proceeding or investigation was in fact
pending or about to be instituted. In assessing such
belief, the word[s] 'about [to begin]' as [they appear]

---

[6] In my view, the foregoing statutory analysis finds additional, supplemen-
tary support in the later legislative proceedings examined at length in Justice
D'Auria's dissenting opinion.

State *v.* Lamantia

in this subsection should be construed more in the sense of probability than of temporal relation. What is important is not that the actor believe that an official proceeding or investigation will begin within a certain span of time but rather that [she] recognize that [her] conduct threatens obstruction of justice [in connection with such a proceeding].'').

Our case law makes clear that § 53a-151 (a) applies to conduct intended to induce a witness to give a false statement to the police if—but only if—''a jury reasonably could infer'' from that conduct that the defendant had ''the requisite intent to induce the [witness] to lie'' or to withhold testimony in a future official proceeding. *State* v. *Ortiz*, supra, 312 Conn. 564–65. For example, in *Ortiz*, we held that the evidence was sufficient to support a reasonable inference that the defendant had the requisite intent, even though an official proceeding was not pending or about to be instituted in a temporal sense at the time he threatened a witness to prevent her from giving a statement to the police, because the evidence was sufficient to support a finding that the defendant intended ''not only [that the witness] withhold information from the police but also withhold testimony or provide false testimony at a future official proceeding.'' Id., 573. Likewise, in *State* v. *Cavallo*, 200 Conn. 664, 513 A.2d 646 (1986), we concluded that the evidence established the requisite intent because the state ''introduced ample evidence to convince a reasonable finder of fact that, at the time of his attempts to so induce the woman, the defendant had known that an arbitration proceeding would soon be pending *and that, during the hearing, the woman would probably be called to testify about her meetings with the defendant* . . . . From this evidence, the jury could reasonably have inferred that the defendant intended to induce the woman to testify falsely.'' (Emphasis added.) Id., 673–74.

State *v.* Lamantia

The fundamental flaw in the majority's reasoning is that it conflates the defendant's knowledge of the existence of a police investigation with the defendant's belief that a future official proceeding is probable, and, in conflating these two different mental states, the majority permits the state to substitute a less demanding mens rea for the operative statutory requirement.[7] The present case illustrates the point. The defendant plainly knew that the police were investigating a minor crime involving a brief fight between two men, and her conduct solidly supports the conclusion that she wanted to avoid an arrest of Rajewski, one among multiple subjects of the investigation. But this state of mind is not enough to establish a violation of our witness tampering statute. To establish that the defendant engaged in criminally culpable conduct intended to "interfere with the courts and our system of justice"; (internal quotation marks omitted) *State* v. *Ortiz*, supra, 312 Conn. 562; the state must produce sufficient evidence for the jury reasonably to find that the defendant undertook her actions with the intent to induce the witness to testify falsely in a future official proceeding. That is, the state must prove not only that the defendant acted under the belief that an official proceeding was likely to be instituted, but also that she intended to induce

_____

[7] The specific intent requirement contained in § 53a-151 cannot be minimized or brushed aside because it serves a vital constitutional function—without it, the statute would be vulnerable to a first amendment challenge. See *State* v. *Cavallo*, supra, 200 Conn. 672 ("We have held today that a defendant is guilty of tampering with a witness only if he intends that his conduct directly cause a particular witness to testify falsely or to refrain from testifying at all. So interpreted, § 53a-151 warns the public that it applies only to conduct intentionally undertaken to undermine the veracity of the testimony given by a witness. Members of the public therefore have no basis for concern that they might be subject to prosecution when their statements unwittingly cause a witness to testify falsely. As long as intent is a necessary element of the crime under § 53a-151, which penalizes only verbal acts relating to a specific pending prosecution, the statute casts no chilling effect on general exhortations concerning cooperation with judicial proceedings.").

State *v.* Lamantia

the witness to lie in that proceeding. By allowing knowl-
edge of the investigation alone to satisfy the state's bur-
den of proof regarding the defendant's specific intent,
the majority has effectively added back into the statute
the very words that the legislature intentionally omitted
when it adopted a modified version of § 241.6 (1) of
the Model Penal Code.[8]

The facts of *Ortiz* are instructive because they serve
to highlight what is missing here. The defendant, Akov
Ortiz, allegedly murdered Louis Labbadia after dis-
covering that Labbadia had given a statement to the
police implicating him in the commission of a burglary.

___

[8] In my view, the majority mistakenly relies on the jury's rejection of the
defendant's in-court testimony to supply the missing evidence of intent. For
the reasons cogently explained in Justice D'Auria's dissenting opinion, the
defendant's credibility, or lack thereof, in the course of providing testimony
at trial is too remote and attenuated from her alleged commission of the
crime to support a reasonable inference that, at the time she texted Rajewski
in 2015, she intended to induce him to testify falsely at a future official
proceeding. The jury plainly was free to disbelieve any or all of the defen-
dant's testimony. It was not free, however, to infer from that disbelief that,
because the defendant was the type of person who was willing to lie at
trial, she also probably had the specific intent, seventeen months earlier,
to tell Rajewski to lie to the police for the purpose of inducing him to testify
falsely in a different official proceeding at some undetermined point in the
future. Cf. Conn. Code Evid. § 4-5 (a) ("[e]vidence of other crimes, wrongs
or acts of a person is inadmissible to prove the bad character, propensity,
or criminal tendencies of that person"); *State* v. *Smith*, 313 Conn. 325, 334,
96 A.3d 1238 (2014) ("[e]vidence of a defendant's uncharged misconduct is
inadmissible to prove that the defendant committed the charged crime or
to show the predisposition of the defendant to commit the charged crime"
(internal quotation marks omitted)); *State* v. *Meehan*, 260 Conn. 372, 395–96,
796 A.2d 1191 (2002) (drawing "distinction between using [uncharged mis-
conduct] evidence to prove an act and using [such] evidence to prove intent"
and holding that evidence of defendant's uncharged misconduct did not
make it "more or less likely that the defendant" had specific intent to commit
crime charged). By holding otherwise, the majority impermissibly dilutes
the state's burden of proof on the essential element of intent in violation
of the constitution. See, e.g., *State* v. *King*, 289 Conn. 496, 519, 958 A.2d
731 (2008) ("any defendant found guilty on the basis of insufficient evidence
has been deprived of a constitutional right" (internal quotation marks omit-
ted)).

State *v.* Lamantia

Id., 555. ''[T]he police considered [Ortiz] a 'principal suspect' in Labbadia's murder.'' Id. The police questioned Ortiz' former girlfriend, Kristen Quinn, ''who, at the time, did not provide the police with any useful information. . . . Quinn informed [Ortiz] that she was in contact with the police and did not want to be involved with [Ortiz] because she thought he might have been involved in Labbadia's murder.'' Id. About one week later, after Labbadia's body was discovered, the police found a ''[d]istraught'' and ''upset'' Ortiz on the Arrigoni Bridge in Middletown. (Internal quotation marks omitted.) Id. ''[Ortiz] informed the officers that he was tired of being accused of things, of something he didn't do, and that anytime anything big ever happen[ed] in Middletown, he [was] blamed for it. Specifically, [Ortiz] stated that he had heard that there were warrants for his arrest out through the Middletown Police Department and that the Middletown police [were] trying to kill [him].'' (Internal quotation marks omitted.) Id., 555–56. After he was taken to the hospital, Ortiz told the police that ''he was tired of being accused of something he didn't do and that he was hearing that the police were accusing him of killing . . . Labbadia.'' (Internal quotation marks omitted.) Id., 556.

''In the following months, [Ortiz] knew that Quinn was speaking with the police.'' Id., 557. He nonetheless confessed to Quinn that he had killed Labbadia. Approximately two months later, Ortiz went to Quinn's home, displayed a small handgun and asked her to come outside. Ortiz ''told Quinn that he had the gun for insurance if she told the cops about what he said about [Labbadia]. [Ortiz] said that if Quinn spoke to the police [her] house was going to go up in smoke . . . . [Ortiz] stated that he knew where Quinn's grandparents lived. [Ortiz] told Quinn that he was going to put [her down] on [her] knees, put the gun to [her] head and scare [her] straight.'' (Internal quotation marks omitted.) Id. ''Quinn subsequently

State *v.* Lamantia

informed the police of these events.'' Id. Ortiz was
arrested, charged, and convicted of, among other crimes,
tampering with a witness. Id., 558.

On appeal, Ortiz argued that the evidence was insuffi-
cient to support his tampering with a witness convic-
tion, but we rejected this claim because his intent to
influence testimony in an official proceeding could be
inferred under the circumstances. Id., 572–74. The evi-
dence supporting this inference consisted of, among
other things, Ortiz' belief that there ''were warrants for
his arrest out through the Middletown Police Depart-
ment and that the Middletown police [were] trying to
kill him.'' (Internal quotation marks omitted.) Id., 573.
We determined that this evidence was sufficient to sup-
port a reasonable inference that, at the time he threat-
ened Quinn, Ortiz ''believed that an official proceeding
probably would be instituted, *regardless of whether
Quinn informed the police about the defendant's con-
fession.*'' (Emphasis added.) Id. Our inquiry in *Ortiz,*
in other words, ultimately and necessarily turned on
the defendant's intent with respect to the official pro-
ceeding itself. Our holding proves the point: ''Because
the jury reasonably could have found that [Ortiz]
believed that an official proceeding was about to be
instituted and that Quinn probably would be called to
testify at that proceeding, we conclude that the jury
reasonably could have inferred that [Ortiz] intended to
induce Quinn to testify falsely or to withhold testimony
at that proceeding.'' Id., 554.

In contrast to *Ortiz,* in the present case, there was
no evidence to support a reasonable inference that, at
the time she sent the text messages to Rajewski, the
defendant subjectively believed that an official proceed-
ing likely would be instituted or that Rajewski would
be a witness in such a proceeding. Nothing in the defen-
dant's text messages directly or indirectly references
the presentation of formal charges or an actual criminal
case that may follow the decision to prosecute, or the

State *v.* Lamantia

introduction of evidence at an eventual criminal trial. Cf. *State* v. *Sabato*, 321 Conn. 729, 748, 138 A.3d 895 (2016) (holding that defendant's "Facebook messages amply supported a finding that the defendant believed that an official proceeding would probably occur" because, in those messages, "the defendant acknowledged that the police were 'getting warrants' and 'building a case' against him," and wrote that he would "eat the charge"); *State* v. *Cavallo*, supra, 200 Conn. 673 (holding that state had "introduced ample evidence to convince a reasonable finder of fact that, at the time of his attempts to [induce the witness to testify falsely], the defendant had known that an arbitration proceeding would soon be pending" because defendant himself initiated arbitration proceeding less than one month later); *State* v. *Mark*, 170 Conn. App. 241, 252, 154 A.3d 564 (evidence was sufficient to support reasonable inference that defendant believed there would be "official proceeding" because, among other reasons, defendant mentioned that "he did not want to leave evidence of the murder weapon at the scene"), cert. denied, 324 Conn. 927, 155 A.3d 1269 (2017).

I recognize that criminal defendants will not always verbalize their subjective intent or state the ultimate purpose of their efforts to obstruct justice. It will always be appropriate, and sometimes necessary, to look at the factual circumstances surrounding the defendant's conduct in each case to ascertain whether it is reasonable to infer that the defendant's attempt to induce a witness to give a false statement to the police was undertaken in contemplation of an official proceeding. Our case law implicitly recognizes that various factors inform this analysis, including, but not limited to, the severity of the crime under investigation,[9] the quantity

_____

[9] The majority states that "[w]itness tampering charges may be brought in connection with any official proceeding, regardless of the seriousness of the underlying crime alleged in that proceeding . . . ." Footnote 14 of the majority opinion. I am not suggesting otherwise. My point is that the severity of the crime is a factor that should be taken into account as part of the

State *v.* Lamantia

and quality of the evidence, and the status of the relevant police investigation. See, e.g., *State* v. *Jordan*, 314 Conn. 354, 383, 102 A.3d 1 (2014) ("when an individual knows that there is significant evidence connecting him to the crime, a jury reasonably could infer that the

inquiry into the defendant's mental state because, in the absence of any direct proof of intent, the context of the offense helps to inform that inquiry. Depending on the seriousness of the crime under investigation, the defendant may have different goals in mind when attempting to induce an individual to give false information to the police; in serious cases, the defendant may be thinking of a process involving not only an arrest but a trial and the prospect of a lengthy prison term; in a less serious situation involving trespassing or minor assault, for example, the defendant may be thinking of nothing beyond whether the subject of the investigation will be arrested. Our case law implicitly recognizes that the severity of the crime is part of the surrounding circumstances that inform the inquiry into the defendant's state of mind, i.e., whether the defendant subjectively believed that an official proceeding was likely to be instituted. For instance, in *State* v. *Sabato*, supra, 321 Conn. 748, although the Appellate Court upheld a defendant's conviction of tampering with a witness in connection with the relatively minor crime of theft of a cell phone, the defendant had articulated his intent to interfere with a future official proceeding, and, therefore, it was unnecessary to consider the circumstances surrounding the defendant's words and conduct in order to ascertain his state of mind. See id. (defendant's Facebook messages "acknowledged that the police were getting warrants and building a case against him" and that defendant intended to "eat the charge" (internal quotation marks omitted)). In contrast to *Sabato*, the defendant in the present case did not articulate her subjective intent. Accordingly, it is necessary to consider the circumstances surrounding the defendant's words and conduct, including the severity of the crime at issue in the future official proceeding, in order to determine whether the evidence is sufficient to support a finding that the defendant believed "that an official proceeding . . . [was] about to be instituted"; General Statutes § 53a-151 (a); when she texted Rajewski.

Contrary to the majority, I do not believe that a fact intensive inquiry, which includes as one factor relevant to the defendant's state of mind the severity of the crime at issue in the future official proceeding, will somehow encourage criminal behavior or invite unnecessary subjectivity, as the majority suggests. By identifying objective factors such as the severity of the crime to guide the inquiry, we actually will reduce the degree of subjectivity involved. It is axiomatic that "[i]ntent is generally proven by circumstantial evidence because direct evidence of the accused's state of mind is rarely available. . . . Therefore, intent is often inferred from conduct . . . and from the cumulative effect of the circumstantial evidence and the rational inferences drawn therefrom." (Citations omitted; internal quotation marks omitted.) *State* v. *Turner*, 252 Conn. 714, 748, 751 A.2d 372 (2000). The severity of the crime, like the other facts and circumstances surrounding a defendant's conduct, is circumstantial evidence of the defendant's intent.

State *v.* Lamantia

individual believed that the investigation probably would progress into an official proceeding''); *State* v. *Foreshaw*, 214 Conn. 540, 543, 550–51, 572 A.2d 1006 (1990) (jury reasonably could have found that defendant believed an official proceeding was about to be instituted when she discarded murder weapon because, after she shot and killed victim in presence of numerous eyewitnesses, she told police that she had discarded weapon ''so that she would not be caught with it''); *State* v. *Mark*, supra, 170 Conn. App. 253 (''the defendant knew that the victim's body was lying on the sidewalk in public view; surely the defendant was aware that an investigation and official proceeding probably would ensue when someone found the victim's body''); *State* v. *Guerrera*, 167 Conn. App. 74, 105, 142 A.3d 447 (2016) (''the jury could have inferred that the defendant was aware that a criminal prosecution was probable in light of the number of witnesses who had seen him with the victim, the threats he made to those witnesses to try to silence them, his knowledge that [his brother] told people about killing the victim, and his firsthand knowledge of the murder and the assault''), aff'd, 331 Conn. 628, 206 A.3d 160 (2019); *State* v. *Njoku*, 163 Conn. App. 134, 139–42, 133 A.3d 906 (holding that evidence was sufficient to sustain defendant's conviction of tampering with witness because, after rape of victim, execution of search warrant and collection of defendant's DNA, defendant asked intermediary to visit victim's family and to ''try to convince them . . . [to] reach an agreement outside the court with him'' (internal quotation marks omitted)), cert. denied, 321 Conn. 912, 136 A.3d 644 (2016); *State* v. *Pommer*, 110 Conn. App. 608, 619–20, 955 A.2d 637 (evidence was sufficient to establish that defendant tampered with witness in official proceeding because ''[t]he defendant knew that the police were aware of the identities of the participants in the robbery'' and that one participant ''had turned herself in to the police'' and implicated defendant), cert. denied, 289 Conn. 951, 961 A.2d 418 (2008).

State *v.* Lamantia

In light of the foregoing principles, I believe that that
the evidence was insufficient to support a reasonable
inference that, at the time the defendant texted Rajew-
ski, she had an intent to influence the testimony of a
witness in a future official proceeding, as opposed to
an intent to influence the statement of a suspect in the
ongoing police investigation. The crime at issue was
not serious—the state itself characterized the assault
as "minor"[10]—and the likelihood of a full-blown prose-
cution in such cases is hardly a foregone conclusion.
The realistic probability of formal proceedings also was
diminished by the relatively equivocal nature of the
evidence. There were no eyewitnesses to the assault
aside from the participants, and they gave wildly differ-
ent accounts of what had transpired—Moulson testified
that he had been attacked by Rajewski and Babcock,
whereas both Rajewski and Babcock testified that they
had been attacked by Moulson.[11] In addition, the police
had just begun their investigation, and, in the immediate
aftermath of the altercation, it was unclear whether a
crime had been committed, who had committed the
crime, and whether any charges were likely to be filed.
The minor nature of the crime, the conflicting accounts
and muddled motivations of the participants, combined
with their inebriated state at the time of the assault,[12]
leads me to believe that an "official proceeding," although
certainly *possible*, did not rise to the level of *probable*.
See *State* v. *Reynolds*, 264 Conn. 1, 97, 836 A.2d 224
(2003) ("An inference is not legally supportable . . .
merely because the scenario that it contemplates is
remotely possible under the facts. To permit such a

---

[10] The police did not transport Moulson to the hospital for medical treat-
ment of his injury. Instead, they arrested him and detained him overnight.

[11] The defendant's attempt to influence Rajewski's statement to the police
appears to be consistent with Rajewski's testimony on this point.

[12] Rajewski testified that he had had "quite a few" alcoholic beverages at
Pistol Pete's bar and was drunk at the time the assault occurred. Babcock
testified that he also was drinking alcohol that evening and likely had any-
where from one to three beers.

State *v.* Lamantia

standard would be to sanction fact-finding predicated on mere conjecture or guesswork.''), cert. denied, 541 U.S. 908, 124 S. Ct. 1614, 158 L. Ed. 2d 254 (2004); see also *State* v. *Jordan*, supra, 314 Conn. 386 (holding that ''the jury would necessarily have to stack inferences based on surmise to conclude that the defendant believed that an official proceeding was probable'' when he discarded clothing implicating him in attempted robbery while fleeing police). At most, the evidence reflects that the defendant intended to tamper with a witness in a police investigation, and, as previously explained, our witness tampering statute does not extend to ''situations in which the defendant believes that only an investigation, but not an official proceeding, is likely to occur.''[13] *State* v. *Ortiz*, supra, 312 Conn. 570.

To support its contrary conclusion, the majority relies on this court's statement in *Ortiz* that, anytime a defendant knows ''that a witness with relevant information already has spoken with the police, a jury reasonably could infer that the [defendant] believed that the investigation probably would progress into an official proceeding.''[14] Id., 571. This statement must be construed in

___

[13] Tampering with a witness is a serious crime with severe penalties—it is a class C felony punishable by a term of imprisonment of ''not less than one year nor more than ten years . . . .'' General Statutes § 53a-35a (7); see also General Statutes § 53a-151 (b). Ironically, the minor crime of assault in the third degree, the investigation into which the defendant interfered in an effort to protect one or both of her boyfriends during the early morning hours of July 25, 2015, is a misdemeanor offense punishable by a maximum term of one year of imprisonment. See General Statutes § 53a-36 (1); see also General Statutes § 53a-61 (b).

[14] In *Ortiz*, this court contrasted the scenario in which there was no evidence linking an individual to a crime and, therefore, no reason to believe that the ''the police would investigate the crime,'' with the scenario in which ''an individual knows that there is significant evidence connecting him to the crime, or, even further, when the individual knows that a witness with relevant information already has spoken with the police . . . .'' *State* v. *Ortiz*, supra, 312 Conn. 570–71. Only in the latter scenario could ''a jury reasonably . . . infer that the individual believed that the investigation probably would progress into an official proceeding.'' Id., 571.

State *v.* Lamantia

light of the factual context in which the case arose—
the crime at issue in *Ortiz* was serious (murder), the
police investigation was extensive, the relevant infor-
mation was damning (Ortiz' confession to the crime of
murder), and Ortiz verbalized his belief that an official
proceeding was likely to be instituted. Id., 555–58, 572–
73. *Ortiz* does not stand for the blanket proposition
that it is reasonable to presume that *every* police investi-
gation will result in the initiation of an official proceed-
ing or that every effort to tamper with a witness at the
investigative stage will be sufficient to establish the
intent to influence that witness in such a proceeding.
Indeed, in *Ortiz*, this court emphasized that the defen-
dant's state of mind, rather than the status of the police
investigation, is the key to ascertaining whether the
defendant's conduct falls within the scope of our wit-
ness tampering statute. See id., 571–72 ("it does not
matter whether the police are at the investigation stage,
the official proceeding stage, or any other stage; as long
as the defendant acts with the intent to prevent a wit-
ness from testifying at an official proceeding, believing
that such a proceeding will probably occur, the defen-
dant has tampered with a witness within the meaning
of § 53a-151 (a)"). The mens rea requirement ensures
that the defendant "recognize[s] that his conduct threat-
ens obstruction of justice"; (internal quotation marks
omitted) id., 570; and "distinguish[es] culpable conduct
from innocent conduct." (Internal quotation marks omit-
ted.) Id., 564.

It is well established that "[i]ntent may be, and usually
is, inferred from [a] defendant's verbal or physical con-
duct. . . . Intent may also be inferred from the sur-
rounding circumstances." (Internal quotation marks
omitted.) Id., 565. The factual circumstances sur-
rounding the defendant's conduct therefore are criti-
cally important in ascertaining whether it is reasonable
to infer that she specifically intended to tamper with a
"witness" in an "official proceeding" within the meaning

State *v.* Lamantia

of § 53a-151 (a). Common sense and experience teach us that the likelihood of a future official proceeding, and the further likelihood of sworn testimony of the relevant witness being adduced at that proceeding, necessarily depends on various factors, including, but not limited to, the factors previously enumerated: the severity of the crime, the identity and importance of the witness, the quantity and quality of the evidence, and the status of the police investigation. Each case must be evaluated on its specific facts, and the focus must remain on the defendant's belief that an official proceeding involving the testimony of the witness likely will result. See *State* v. *Jordan,* supra, 314 Conn. 383 ("[t]his analysis ensures that the focus of the inquiry is on the culpability of the actor, rather than on external factors wholly unrelated to [the actor's] purpose of subverting the administration of justice" (internal quotation marks omitted)). To hold otherwise is to rewrite our witness tampering statute to include *all police investigations*, and this we cannot do. See *Doe* v. *Norwich Roman Catholic Diocesan Corp.*, 279 Conn. 207, 216, 901 A.2d 673 (2006) ("It is axiomatic that the court itself cannot rewrite a statute to accomplish a particular result. That is a function of the legislature." (Internal quotation marks omitted.)).

My conclusion, once again, is informed by the fact that our legislature purposefully omitted tampering with an individual in a police investigation from the purview of our witness tampering statute. That legislative choice is an important determination of public policy that cannot be stripped of all meaning. See *Lewis* v. *Gaming Policy Board*, 224 Conn. 693, 709, 620 A.2d 780 (1993) ("the primary responsibility for formulating public policy must remain with the legislature," not the courts (internal quotation marks omitted)). Nor can we ignore completely the rule of lenity. "[I]t is axiomatic that we must refrain from imposing criminal liability where the legislature has not expressly so intended."

State *v.* Lamantia

(Internal quotation marks omitted.) *State* v. *Peeler*, 271 Conn. 338, 434, 857 A.2d 808 (2004), cert. denied, 546 U.S. 845, 126 S. Ct. 94, 163 L. Ed. 2d 110 (2005); see also *State* v. *Drupals*, 306 Conn. 149, 160, 49 A.3d 962 (2012) (''[W]hen the statute being construed is a criminal statute, it must be construed strictly against the state and in favor of the accused. . . . [C]riminal statutes [thus] are not to be read more broadly than their language plainly requires and ambiguities are ordinarily to be resolved in favor of the defendant. . . . Rather, penal statutes are to be construed strictly and not extended by implication to create liability which no language of the act purports to create.'' (Citations omitted; internal quotation marks omitted.)).

The majority's holding strays too far afield from the statutory text and materially alters its meaning in the process. The phenomenon is not uncommon—a statute is extended to its outer limit by construction in one or more judicial opinions, with each decision taking one successive step away from the original text by jumping off from the gloss adopted in the previous case, until the gloss becomes the law itself, and the original text merely a distant speck on the horizon. Referring to this phenomenon, Judge Frank H. Easterbrook of the United States Court of Appeals for the Seventh Circuit cautioned: ''As we are supposed to enforce the *statutes* [enacted by legislature], and not the glosses on those statutes, we must take care that the judicial process does not contribute to the distortion of meaning.'' (Emphasis in original.) *Hickey* v. *Duffy*, 827 F.2d 234, 242 (7th Cir. 1987). ''Unless courts continually check back with the sources of their authority, the process of interpretation can become a rumor chain. Tiny variations at each retelling cascade, until the tale is unrecognizable to its originator.'' Id.; see also *National Labor Relations Board* v. *International Brotherhood of Electrical Workers, Local 340*, 481 U.S. 573, 597–98, 107 S. Ct. 2002, 95 L. Ed. 2d 557 (1987) (Scalia, J., concurring

State *v.* Lamantia

in the judgment) (''[T]he [c]ourt, having already sanctioned a point of departure that is genuinely not to be found within the language of the statute, finds itself cut off from that authoritative source of the law, and ends up construing not the statute but its own construction. Applied to an erroneous point of departure, the logical reasoning that is ordinarily the mechanism of judicial adherence to the rule of law perversely carries the [c]ourt further and further from the meaning of the statute. Some distance down that path, however, there comes a point at which a later incremental step, again rational in itself, leads to a result so far removed from the statute that obedience to text must overcome fidelity to logic.''). In my view, the majority opinion has distorted the meaning of our witness tampering statute by applying a judicial gloss that extends criminal culpability to conduct that the legislature clearly and expressly intended to exclude from the scope of § 53a-151 (a), namely, a defendant's attempt to influence another person's statement to the police for the purpose of influencing a police investigation. I therefore dissent.